Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PUBLIC UTILITY DISTRICT NO. 1 OF
SNOHOMISH COUNTY WASHINGTON,
                    *Petitioner,*

RELIANT ENERGY SERVICES INC.,
                    *Intervenor,*

          v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent.*

No. 03-72511

FERC No.
EL02-26 et al.

SOUTHERN CALIFORNIA WATER
COMPANY,
                    *Petitioner,*

ENRON POWER MARKETING INC.,
                    *Intervenor,*

          v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent.*

No. 03-74757

FERC No.
EL-02-28

ATTORNEY GENERAL, STATE OF
NEVADA,
                    *Petitioner,*

BP ENERGY COMPANY; MIRANT
AMERICAS ENERGY MARKETING,
L.P.,
                    *Intervenors,*

              v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent.*

No. 04-70712
FERC No.
EL02-28-004

NEVADA POWER COMPANY; SIERRA
PACIFIC POWER COMPANY,
                    *Petitioners,*

              v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent.*

No. 03-74617
FERC No.
EL02-26-000

PUBLIC UTILITY DISTRICT NO. 1 OF
SNOHOMISH COUNTY WASHINGTON
*Petitioner,*

CALPINE ENERGY SERVICES, L.P.; EL
PASO MERCHANT ENERGY L.P.;
MORGAN STANLEY CAPITAL GROUP,
INC.; MIRANT AMERICAS ENERGY
MARKETING, LP; BP ENERGY CO.;
ALLEGHENY ENERGY SUPPLY CO.,
LLC; AMERICAN ELECTRIC POWER
SERVICE CORPORATION,
*Intervenors,*

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
*Respondent.*

No. 03-74208

FERC No.
EL02-26, et al

OPINION

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
December 8, 2004—Pasadena, California

Filed December 19, 2006

Before: James R. Browning, Harry Pregerson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

Stephen M. Ryan, Manatt, Phelps & Phillips LLP, Washington, DC, argued the case and was on the briefs of petitioners Nevada Power Company and Sierra Pacific Power Company. Roger A. Berliner, Manatt, Phelps & Phillips LLP, Washington, DC, and C. Stanley Hunterton, Hunterton & Associates, Las Vegas, Nevada, were also on the briefs as attorneys for the same parties.

Randolph Lee Elliot, Miller, Balis & O'Neil PC, Washington, DC, argued the case and was on the briefs of petitioner Southern California Water Company. Christopher M. Lyons was also on the briefs as attorney for the same party.

Eric L. Christensen, Assistant General Counsel, argued the case and was on the briefs of petitioner Public Utility District No. 1 of Snohomish County, Washington. Howard M. Goodfriend, Edwards, Sieh, Smith & Goodfriend PS, Seattle, Washington, and Michael J. Gianunzio, General Counsel, were also on the briefs as attorneys for the same party.

Timothy Hay, Chief Deputy Attorney General and Consumer Advocate, John E. McCaffrey, Stinson, Morrison, & Hecker LLP, Washington, DC, and Eric Witkowski, Senior Deputy Attorney General, were on the briefs of petitioner Office of the Nevada Attorney General, Bureau of Consumer Protection.

Lona T. Perry, Attorney, Federal Energy Regulatory Commission, Washington, DC, argued the case and was on the briefs of the respondent. Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor, were also on the briefs as attorneys for the respondent.

Richard L. Hinckley, General Counsel, was on the brief of intervenor Public Utilities Commission of Nevada.

William J. Kayatta, Jr., Jared S. des Rosiers, Louise K. Thomas, Deborah L. Shaw, Christopher T. Roach, Pierce Atwood, Portland, Maine, and Erik N. Saltmarsh, Erin Koch-Goodman, California Electricity Oversight Board, Sacramento, California, were on the joint brief of the intervenors, as attorneys for California Electricity Oversight Board. Arocles Aguilar, Sean Gallagher, Jonathan Bromson, Public Utilities Commission of the State of California, San Francisco, California, were on the joint brief of the intervenors, as attorneys for the Public Utilities Commission of the State of California.

Richard P. Bress, Michael J. Gergen, Jared W. Johnson, David G. Tewksbury, Stephanie S. Lim, Latham & Watkins LLP, Washington, DC, were on the brief of intervenor Mirant Americas Energy Marketing LP.

Paul J. Pantano, Jr. and Catherine M. Krupka, McDermott, Will & Emery LLP, Washington, DC, were on the brief of intervenor Morgan Stanley Capital Group Inc.

Kenneth W. Irvin, Morrison & Foerster LLP, Washington, DC, argued the case and was on the joint brief of the interve-

nors in support of the respondent, as attorney for El Paso Merchant Energy, LP. Edward J. Twomey and Bruce Barnard were also on the joint brief as attorneys for the same party.

Merrill L. Kramer, Robert Shapiro, and Robin D. Ball, Chadbourne & Park LLP, Washington, DC, were on the joint brief of the intervenors in support of the respondent, as attorneys for Allegheny Energy Supply Company, LLC.

Clark Evans Downs, Martin V. Kirkwood, Kenneth B. Driver, Jonathan F. Christian, Jones Day, Washington, DC, were on the joint brief of the intervenors in support of the respondent, as attorneys for American Electric Power Service Corp.

Mark R. Haskell, Morgan, Lewis & Bockius LLP, Washington, DC, was on the joint brief of the intervenors in support of the respondent, as attorney for BP Energy Company.

Sarah G. Novosel, Calpine Corporation, Washington, DC, was on the joint brief of the intervenors in support of the respondent, as attorney for Calpine Energy Services, LP.

Charles A. Moore, Leboeuf, Lamb, Greene & MacRae, LLP, Houston, Texas, was on the joint brief of the intervenors in support of the respondent, as attorney for Enron Power Marketing, Inc.

Randoplph Q. McManus and Melissa E. Maxwell, Baker Botts LLP, Washington, DC, were on the joint brief of the intervenors in support of the respondent, as attorney for Reliant Energy Services, Inc.

## OPINION

BERZON, Circuit Judge:

The energy crisis in 2000-2001 resulted in extreme power shortages and price volatility in California and other western states. This consolidated appeal raises several interrelated issues concerning a series of wholesale energy contracts for future energy supplies — known as "forward" contracts — entered into by power companies in California, Nevada, and Washington during the energy crisis. Petitioners, including retail power companies and state agencies,[1] contended before the Federal Energy Regulatory Commission (FERC) that the contracts should be modified, but FERC concluded that they should not be.

Petitioners (the "local utilities") now allege that FERC, in so deciding, did not appropriately apply the just and reasonable standard set by section 206(a) of the Federal Power Act (FPA).[2] They allege that FERC erred in applying the *Mobile-*

---

[1]Petitioners are Public Utility District No. 1 of Snohomish County, Washington (Snohomish); Southern California Water Company (Southern Cal Water); Nevada Power Company (Nevada Power); and Sierra Pacific Power Company (Sierra Pacific); and the Office of the Nevada Attorney General, Bureau of Consumer Protection.

[2]Although the statute was amended slightly in 2005, this opinion exclusively refers to, and quotes from, the 2000 version. Section 206(a) provided:

> Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is *unjust, unreasonable*, unduly discriminatory or preferential, the Commission shall determine the *just and reasonable* rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

16 U.S.C. § 824e(a) (2000) (emphasis added). Notably, this provision expressly applied to "any . . . *contract*," as well as to rates unilaterally set.

*Sierra* "public interest" mode of review[3] to contracts that were (1) not subject to meaningful initial review or approval, and (2) formed during one of the most erratic and bizarre periods of activity for the western energy market.

We hold that FERC erred both in its procedural reliance on *Mobile-Sierra*[4] and in the substantive standard it used in determining that the contracts at issue did not affect the public interest. FERC's reliance on *Mobile-Sierra* was misplaced because its grant of market-based rate authority lacked a mechanism to provide effective, timely relief from unjust and unreasonable rates due to market dysfunction, thereby creating a gap in the FPA's protection against excessive energy prices. Although we would remand to FERC solely because its application of *Mobile-Sierra* was therefore procedurally improper, we further hold that the agency's finding that the challenged contracts do not affect the public interest was based on a substantively erroneous mode of analysis. A remand is therefore necessary to allow FERC the opportunity to review these complaints in the first instance in light of these holdings and determine whether the challenged rates meet the statutory standard.

## I.  *The Federal Power Act and* **Mobile-Sierra**

The FPA governs the actions of public utilities, defined as "any person who owns or operates facilities subject to the jurisdiction of the [Federal Energy Regulatory] Commission." 16 U.S.C. § 824(e). The Commission's jurisdiction covers the "transmission of electric energy in interstate commerce and

---

[3]This shorthand takes its name from two Supreme Court cases decided on the same day, *United Gas Pipe Line Co. v. Mobile Gas Service Corp.* (*Mobile*), 350 U.S. 332 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.* (*Sierra*), 350 U.S. 348 (1956).

[4]We use the term "*Mobile-Sierra*" throughout this opinion to refer both to the two original Supreme Court cases and to the doctrine derived from them.

the sale of such energy at wholesale in interstate commerce." *Id*. § 824(a). This definition encompasses activities carried out by all of the Intervenor-Respondent companies.

The FPA requires FERC to regulate public utilities for the benefit of consumers. *See Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) ("A major purpose of the whole [Federal Power] Act is to protect power consumers against excessive prices."); *California ex rel. Lockyer v. FERC* (*Lockyer*), 383 F.3d 1006, 1017 (9th Cir. 2004) (describing "protecting consumers" as the FPA's "primary purpose"); *see also Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 388 (1959) ("The [Natural Gas] Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges.").

Two FPA provisions, sections 205 and 206, 16 U.S.C. §§ 824d, 824e, govern FERC's authority and establish its obligation to regulate rates for the interstate sale and transmission of electricity. Through these provisions, the FPA empowers FERC to regulate wholesale electricity rates but *not* the rates charged directly to consumers by local utilities. *See* 16 U.S.C. § 824(a), (b)(1). The protection the FPA accords consumers is therefore indirect: By assuring that wholesale purveyors of electric power charge fair rates to retailers, the FPA protects against the need to pass excessive rates on to consumers. At the same time, by assuring that wholesale purveyors of electric power receive a fair rate of return, the FPA assures that such sellers have the incentive to continue to produce and supply power.

The First Circuit has aptly described the interaction of sections 205 and 206:

> In regulating electricity rates, the Federal Power Act follows (with variations) a well-developed model: the utility sets the rates in the first instance, 16 U.S.C. § 824d(a), subject to a basic statutory obliga-

tion that rates be just and reasonable and not unduly discriminatory or preferential, *id.* §§ 824d(a)-(b). FERC, which inherited the powers of its predecessor (the Federal Power Commission), can investigate a newly filed rate (section 205, *id.* § 824d(e)), or an existing rate (section 206, *id.* § 824e(a)), and, if the rate is inconsistent with the statutory standard, order a change in the rate to make it conform to that standard, *id.* §§ 824d(e), 824e(a)-(b).

The procedural incidents and FERC's ability to provide refunds vary depending on whether the proceeding is one to investigate a new rate filing or an existing rate. For example, in the former case, the burden is on the utility to show that its rate is lawful, 16 U.S.C. § 824d(e), and, in the latter, the burden is on the FERC staff or the customer to show that the rate is unlawful, *id.* § 824e(b). In both circumstances, however, the statutory test of lawfulness is phrased in the same terms.

*Boston Edison Co. v. FERC*, 233 F.3d 60, 64 (1st Cir. 2000) (footnote omitted). Additionally, when utilities set rates in the first instance, they may do so via privately-negotiated contracts, filed pursuant to section 205(c)-(d), 16 U.S.C. § 824d(c)-(d).[5] Thus, the FPA, by its terms, creates a role for

---

[5]Section 205(c)-(d), 16 U.S.C. § 824d(c)-(d), provides:

(c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, *together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.*

privately negotiated wholesale power contracts, balanced by
FERC's obligation to ensure that those contracts rates, like
unilaterally filed rates, are "just and reasonable."

Two Supreme Court decisions, announced on the same day
in 1956, explain the approach that federal regulators must
apply in certain circumstances when reviewing challenges
maintaining that contracted rates are too low to be just and
reasonable. *See United Gas Pipe Line Co. v. Mobile Gas Serv.
Corp.* (*Mobile*), 350 U.S. 332 (1956);[6] *Fed. Power Comm'n
v. Sierra Pac. Power Co.* (*Sierra*), 350 U.S. 348 (1956).
These decisions explain how, in the context of the energy
industry as it existed in 1956, FERC was to ensure that whole-
sale contracts were "just and reasonable."

In *Mobile*, a seller agreed to a long-term fixed rate contract
with another business, and the agency accepted it for filing

---

   (d)   Notice required for rate changes

     Unless the Commission otherwise orders, no change shall be
made by any public utility in any such rate, charge, classification,
or service, or in any rule, regulation, or *contract* relating thereto,
except after sixty days' notice to the Commission and to the pub-
lic. Such notice shall be given by filing with the Commission and
keeping open for public inspection new schedules stating plainly
the change or changes to be made in the schedule or schedules
then in force and the time when the change or changes will go
into effect. The Commission, for good cause shown, may allow
changes to take effect without requiring the sixty days' notice
herein provided for by an order specifying the changes so to be
made and the time when they shall take effect and the manner in
which they shall be filed and published.

(Emphases added).

   [6]*Mobile* related to the Natural Gas Act, and so did not involve a FPA
claim. The Supreme Court, however, referred in *Mobile* to "the virtually
identical provisions of the Federal Power Act," 350 U.S. at 346, and the
doctrine derived from *Mobile* always has been understood to be fully
applicable to FPA section 206(a) cases.

under section 205. The Court held that the seller could not unilaterally increase a contracted rate by filing a new rate under section 205(d), reasoning that the statute "evinces no purpose to abrogate private rate contracts," *Mobile*, 350 U.S. at 338, and recognizing the need for "individualized arrangements" between suppliers and distributors, *id.* at 339. The Court emphasized that the public is served by the negotiation and enforcement of private contracts: "By preserving the integrity of contracts, [the Natural Gas Act] permits the stability of supply arrangements which all agree is essential to the health of the . . . industry." *Id.* at 344. At the same time, the Court made clear that while "permit[ting] the relations between the parties to be established initially by contract," the Natural Gas Act provided for "the protection of the public interest . . . by supervision of the individual contracts, which to that end must be filed with the Commission and made public." *Id.* at 339.

*Sierra* took up where *Mobile* left off, echoing the principle that a unilateral filing of a new rate cannot supersede a contract rate, even if the new rate is just and reasonable. *Sierra*, 350 U.S. at 352-53. The Court then extended *Mobile* to section 206 cases, holding that when a public utility agrees "by contract to a rate affording *less than a fair return*," then the "sole concern" of the Federal Power Commission (FERC's predecessor) in section 206(a) review is "whether the rate is *so low* as to adversely affect the public interest." *Id.* at 355 (emphases added). As the emphasized language indicates, *Sierra* dealt only with whether a challenged contract rate was too low to serve the public interest. It did not deal with a contract rate alleged to be too high. In these low-rate cases, the Court declared, "the purpose of the power given the Commission by § 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities," as "a contract may not be said to be either '*unjust*' *or* '*unreasonable*' simply because it is unprofitable to the public utility." *Id.* (emphasis added).

*Sierra* thus did not purport to abandon the "just and reasonable" standard in the statute. Rather, it gave substance to that standard in circumstances in which the contention is that the seller of energy finds a long-term contract it entered into no longer profitable. Relying on section 201 of the FPA and reciting that "the scheme of regulation imposed by [the FPA] is necessary in the public interest," the Court held that when a seller seeks to raise rates after a contract has gone into effect, only "public interest" factors are pertinent to the "just and reasonable" inquiry, including whether the rate "might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Id.* (internal quotation marks omitted).

*Mobile-Sierra*, then, stands for the proposition that *in certain circumstances*, a presumption applies that private parties to a wholesale electric power contract have negotiated a "just and reasonable" contract over a designated period of time, lawful under the FPA throughout that period.[7] That presumption can be rebutted by establishing that the contract adversely affects the public interest — that is, the interests of the consuming public that the FPA protects.[8]

---

[7]The parties and some of the cases speak as if two alternative standards for reviewing wholesale electricity rates exist — the statutory "just and reasonable" standard and the *Mobile-Sierra* public interest standard. We do not find this way of viewing the statutory terrain useful. The FPA establishes a single, albeit general, standard for FERC's adjudication of contract challenges like the present one: whether the challenged contract is "just and reasonable." 16 U.S.C. § 824e(a). The question therefore cannot be not whether the *Mobile-Sierra or* the "just and reasonable" standard of review applies. Instead, we understand *Mobile-Sierra* to establish presumptions regarding whether certain electricity contracts meet the statutory standard, and hold that lack of profitability alone is not a basis for deeming a contract unreasonable when the seller has agreed to the rate that proves unprofitable.

[8]As already noted, the specific factors mentioned in *Sierra* as rebutting this presumption apply to cases challenging a contract rate for being too low. *Mobile* and *Sierra* had no occasion to determine what factors must be shown in other situations.

As we explain in Part II of this opinion, *Mobile* and *Sierra* arose in a regulatory context in which there was an opportunity for traditional cost-based just and reasonable review before the energy contracts at issue became effective. The regulatory regime evolved, however, and FERC shifted its inquiry from the permissible cost-basis of rates to the determination of a seller's market power. We therefore confront here, for the first time, the intersection of *two* doctrines — one, the *Mobile-Sierra* doctrine, the product of the courts; the other, market-based rate authorization, the product of recent agency policy — as they affect the application of the just and reasonable standard. No case that we have found concerns the intersection of these two doctrines.

While the object of the *Mobile-Sierra* doctrine was an individual contract, the market-based rate authorization inquiry applies to an individual seller, with regard to any covered contract for electrical energy it enters into. The former inquiry occurred contemporaneously with a contract's formation, while the latter inquiry transpires before each contract is formed. This dual shift distinguishes the regulatory context here from that present in *Mobile* and *Sierra* in two material respects: (1) the *timing* of the agency's initial review has moved to a point *before* contract formation, and (2) the *substance* of that review no longer focuses on the *terms of the contract*. In other words, since *Mobile* and *Sierra* were decided, both the questions that FERC asks in its initial regulatory review of rates and when it asks them have changed.

Although this regulatory evolution does not render *Mobile-Sierra* a dead letter, it reinforces the need to delineate carefully the prerequisites for its application in the present environment. Our principal question is therefore whether the circumstances that trigger the *Mobile-Sierra* presumption are present in this case. As we explain in Part IV of this opinion, we conclude from the context of *Mobile-Sierra* and from later cases that three prerequisites are necessary to establish the *Mobile-Sierra* presumption: (1) the contract by its own terms

must not preclude the limited *Mobile-Sierra* review; (2) the regulatory scheme in which the contracts are formed must provide FERC with an opportunity for effective, timely review of the contracted rates; and (3) where, as here, FERC is relying on a market-based rate-setting system to produce just and reasonable rates, this review must permit consideration of all factors relevant to the propriety of the contract's formation.

Taken together, the satisfaction of these three conditions justifies a presumption that parties have negotiated a contract that is just and reasonable between them and therefore triggers the *Mobile-Sierra* public interest mode of review, adjusted to account for the circumstance in which it is the buyer rather than the seller that is challenging the existing contract. When the prerequisites have not been met, however, the *Mobile-Sierra* presumption cannot apply, and FERC must find another method of evaluating whether the challenged rates are just and reasonable.

To explain the origins of these *Mobile-Sierra* prerequisites and illuminate the current role of the doctrine, we begin by considering the historical and regulatory context in which *Mobile-Sierra* developed and the changes in that context since those cases were decided. We then turn to the facts and proceedings underlying the current dispute and, finally, to the derivation and application of the *Mobile-Sierra* prerequisites and standards.

## II.  *Evolution of Power Utility Regulation*

### A.  Early Regulation of Utility Monopolies

Congress passed the Federal Power Act in 1920, establishing the statutory framework described above. Ch. 285, 41 Stat. 1063 (1920). This framework emerged from a wider body of state and federal regulation that revolved around the by-then "familiar mandate" that rates in various industries be

"just and reasonable." *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 477 (2002).[9] Before Congress had passed many laws regulating national industries, state legislatures created specialized agencies "to set and regulate rates." *Id.* In the electric power industry, this effort began in the first decade of the twentieth century. By 1914, forty-five states had enacted electricity regulation laws. Richard F. Hirsh, Power Loss: The Origins of Deregulation and Restructuring in the American Electric Utility System 19-26 (1999).

The national government's first substantial foray into rate regulation occurred in 1887, with the passage of the Interstate Commerce Act. Ch. 104, 24 Stat. 379 (1887). This statute, primarily concerned with interstate railroad rates, formed "the model for subsequent federal public-utility statutes like the Federal Power Act." *Verizon*, 535 U.S. at 478 n.3. Under the Interstate Commerce Act, railroad carriers would first propose rate schedules, termed "tariffs." Then, interested parties could comment to the agency, which would accept the tariff so long as it was "just and reasonable." *Id.* at 478.

The states and Congress applied this structure to the electric power industry on the basis of two widely-shared assumptions:

*First*, policymakers assumed that public utilities were "natural monopolies" because, among other reasons, it would be inefficient for competing utilities to string parallel power lines. Timothy P. Duane, *Regulation's Rationale: Learning from the California Energy Crisis*, 19 Yale J. on Reg. 471, 476-77 (2002). Also, utilities could benefit from economies of scale, making a monopoly more efficient than a competitive market. *See* Hirsh, *supra*, at 17-18.

---

[9]*Verizon* concerned the Telecommunications Act of 1996, which is not relevant to the present case. *Verizon* did, however, include a broader historical discussion of utility regulation, *see* 535 U.S. at 477-89, that directly relates to energy regulation.

*Second*, these monopolies, like any monopoly, would be tempted to abuse their market power. Moreover, because electricity cannot be stored, it needed to be produced at the same time consumers demanded it. Shortages anywhere on an interconnected electricity grid could threaten the entire system. The factors unique to the electric power industry made it particularly susceptible to abuse of market power: A local utility could withhold power, demand higher rates, and credibly threaten to disrupt a regional or national market. Regulation would keep local utilities in check. Duane, *supra*, at 477-78.

Early state and federal agencies created two categories of regulated rates: "retail rates charged directly to the public and wholesale rates charged among businesses involved in providing" the regulated good or service. *Verizon*, 535 U.S. at 478. Under the FPA, the federal government regulates only interstate wholesale electric power sales and interstate electric power transmission, leaving to the states the regulation of rates charged to consumers. *See* 16 U.S.C. § 824(a), (b)(1). State and local governments, therefore, generally focused on rates "as between businesses and the public," while the federal government regulated rates "as between businesses." *Verizon*, 535 U.S. at 479.

As a result of these differences in their regulatory focus, important differences in methodology developed between federal and state energy rate regulation. Knowing that state regulators focused on rates charged directly to the public and following Congress's "acknowledg[ment] that contracts between commercial buyers and sellers could be used in rate-setting," *id.* (citing section 205(d) and *Mobile*, 350 U.S. at 338-39), the Federal Power Commission (FPC) and, later, FERC — both bound by *Mobile-Sierra* — became less inclined to step in and alter filed rates charged among businesses in the energy industry. Even if those agencies wanted to change contract rates, courts, applying *Mobile-Sierra*, would generally assume that those rates were just and reasonable and would probably not harm the public interest. The

underlying assumption was that "[i]n wholesale markets, the party charging the rate and the party charged were often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them." *Id.* The equal market power of those businesses and the role of state regulation of rates charged to consumers allowed the federal government to set a relatively high bar for proving that a wholesale contract was unjust or unreasonable based on impact on the public. Federal agencies, including the FPC and its successor agency FERC, thus saw their "principal regulatory responsibility" as preventing discrimination "by favorable contract rates between allied businesses" as compared to other businesses. *Id.* At the same time, *Sierra*'s admonition that federal regulators *should* reform contracts if that was "necessary in the public interest," *Sierra*, 350 U.S. at 355 (internal quotation mark omitted), confirmed a continuing federal responsibility to review the impact of wholesale contracts on the public, even though the federal government did not directly regulate rates charged to consumers.

In contrast to federal regulators, state regulators "focused more on the demand for 'just and reasonable' rates to the public than on the perils of rate discrimination." *Verizon*, 535 U.S. at 480. In California, for instance, the Public Utilities Commission ensured that rates charged by the state's three primary utilities — Pacific Gas & Electric, Southern California Edison, and San Diego Gas & Electric — were just and reasonable to the consuming public. *See* CAL. CONST. art. XII, § 6; Duane, *supra*, at 480.

Within this two-tiered regulatory structure, case law developed an evolving definition of the "just and reasonable" standard. *See Verizon*, 535 U.S. at 481-89. After decades-long debates not relevant here, courts and regulators settled on a system that attempted to match rates to the cost to the utility of providing the service, including "the cost of prudently invested capital used to provide the service." *Id.* at 485. This

"prudent-investor rule" was designed to provide incentives for utilities to invest in necessary capacity-building by allowing them to charge rates that would provide a fair rate of return on those investments while at the same time "protect[ing] ratepayers from supporting excessive capacity, or abandoned, destroyed, or phantom assets." *Id.* at 486. These competing elements of cost of service regulation were intended to "mimic natural incentives in competitive markets." *Id.*; *see also Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1510 (D.C. Cir. 1984). As a result, cost of service regulation would, in theory, lead to the same rates that would exist in a properly functioning unregulated market.

## B.   Federal and State Regulatory Reform

Our description thus far covers the regulatory landscape through the mid-1990s. Beginning then, the electric power industry saw "complementary initiatives by the FERC and state agencies" to shift from a cost-based rate regulation regime to a market-based regime. Carmen L. Gentile, *The* Mobile-Sierra *Rule: Its Illustrious Past and Uncertain Future*, 21 ENERGY L.J. 353, 373 (2000).

This move toward energy regulation reform was premised on a new set of widely-shared assumptions:

*First*, cost-based regulation did not effectively check public utilities' market power. *See Verizon*, 535 U.S. at 486 ("[T]he prudent-investment rule in practice often [was] no match for the capacity of utilities having all the relevant information to manipulate the rate base . . . ."); Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, FERC Order 888-A, 62 Fed. Reg. 12,274, 12,275 (Mar. 14, 1997) ("[A]bsent open access, undue discrimination will continue . . . ."); HIRSH, *supra*, at 33-54 (describing how "[u]tility [m]anagers [g]ain[ed] [d]ominance" within the earlier regula-

tory scheme). Also, local utilities would often deny competitors access to their transmission networks, protecting their monopoly status within a geographic area. *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 4 (D.C. Cir. 2002).

*Second*, with technological changes, public power utilities no longer needed to be monopolies. Technological innovations now permitted transmission of power over longer distances, allowing consumers to obtain power from beyond the geographic range of their local utility. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 681 (D.C. Cir. 2000) (per curiam) (upholding FERC's 1996 reform orders), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

*Third*, the newly feasible market competition could drive down wholesale prices and measure the cost of service, including the cost of long-term investments, more accurately than did the previous regulatory regime. Competition, this thesis posits, "at least over the long pull," will lead to prices that "approximate [marginal] cost," including a return on capital sufficient to ensure that companies have financial incentives to provide power. *Interstate Natural Gas Ass'n of Am. v. FERC* (*INGAA*), 285 F.3d 18, 31 (D.C. Cir. 2002).

Based on these assumptions, FERC decided in 1996 to fundamentally reform its regulation of the nation's interstate wholesale electricity markets. FERC's orders implementing this electrical power reform, Orders 888 and 889, required each utility that operates transmission lines to allow any other utility in the interstate energy market to use its transmission lines on the same terms applicable to the operating utility itself.[10]

---

[10]According to FERC, open access is the first of "two central components." Order 888-A, 62 Fed. Reg. at 12,276. The second central component of the 1996 Orders is their mechanism for allowing utilities to recover "stranded costs," that is, costs which they incurred under the previous regulatory regime based upon an expectation of repayment that may not occur in newly competitive markets. *Id.*

*Transmission Access*, 225 F.3d at 681-82; Promoting Whole-sale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996). Taking advantage of the newly available "open access," utilities would, in theory, have both the market incentives and the legal right to compete with each other. This competition would provide retail consumers with the opportunity to purchase power from a wide variety of producers at relatively lower rates. *Transmission Access*, 225 F.3d at 683. A factory in Albany, California, for example, could, in theory, purchase power from a power plant in Albany, New York, no longer limited in its options to whatever the local utility would sell. Local energy utilities, could, rather than producing their own power to sell to the public, choose between various competing producers and then transfer the expected savings from this competition to the public. FERC estimated that, as a result of such competition, consumers would benefit from annual savings of $3.8 billion to $5.4 billion. Order 888-A, 62 Fed. Reg. at 12,276.

A crucial element of FERC's 1996 "open access" reforms was the connection between "open access" and an "open access" utility's authority to charge whatever rates the market would bear. "[A]pproximately a decade ago, companies began to file market-based tariffs that did not specify the precise rate to be charged," and instead indicated that they would charge market-based rates. *Lockyer*, 383 F.3d at 1012. FERC would approve those tariffs if the public utility proved that it lacked, or had adequately mitigated, any ability to significantly affect market prices. *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 365 & n.1 (D.C. Cir. 1998); *see also Sw. Pub. Serv. Co.*, 72 F.E.R.C. ¶ 61,208, at ¶ 61,966 (1995) (summarizing criteria for approving market-based rate tariffs). Such grants of market-based rate authorization were open-ended. *See, e.g.*, *So. Co. Servs., Inc.*, 87 F.E.R.C. ¶ 61,214, at ¶ 61,847 n.3.

FERC's 1990s reforms specified open access as one criteria necessary to demonstrate the lack, or adequate mitigation, of market power. When a public utility implemented an "open access" policy, it demonstrated that it lacked market power regarding "sales from its existing [power generation] capacity" and was thus entitled to market-based rate authority — that is, the ability to charge whatever rates the market would bear — when it sold power over open access transmission grids. *See* Order No. 888, 61 Fed. Reg. at 21,553; *see Lockyer*, 383 F.3d at 1013 (describing FERC's test for granting market-based rate authority as "consist[ing] of a finding that the applicant lacks market power (or has taken sufficient steps to mitigate market power)"); *cf.* EDWARD KAHN, ELECTRIC UTILITY PLANNING AND REGULATION 319 (1991) (describing the *lack* of open access as allowing "market power [to] interfere with market efficiency").

FERC thus based its 1996 reform — and, as this case makes clear, much of its subsequent regulation — on the belief that "open access" would create market forces helping to ensure that no utility could exercise market power when selling wholesale power. *See* Order No. 888, 61 Fed. Reg. at 21,554 ("[I]ncreased competition resulting from open access transmission may reduce or even eliminate generation-related market power in the short-run market . . . ."); *id.* at 21,555 ("[T]he Commission expects this Rule to facilitate the development of competitive bulk power markets . . . ."). FERC tempered this expectation by promising to "continue our case-by-case approach" to granting market-based rate authority. *Id.* FERC's "case-by-case approach" includes ensuring that sellers seeking market-based rate authority lack, or have sufficiently mitigated, market power *and* that FERC has a sufficient "means of monitoring the market in which [the seller's] sales will take place." *Entergy Servs., Inc.*, 58 F.E.R.C. ¶ 61,234, ¶ 61,753-54 (1992); *see also Lockyer*, 383 F.3d at 1016 (requiring a market-based regime to include "implied enforcement mechanisms sufficient to provide substitute remedies for the obtaining of refunds"); *Transwestern Pipeline*

*Co.*, 43 F.E.R.C. ¶ 61,240, at ¶ 61,650 (1988) (requiring a finding that "competition in the relevant markets will operate as a meaningful constraint on the exercise of market power"). Following the *Entergy* approach, FERC also promised to "modify our market rate criteria if and when appropriate," but specified that any such modification would "not upset transactions entered into pursuant to existing market-based rate authority." Order 888, 61 Fed. Reg. at 21,555.

Like FERC, California challenged the monopoly power of electric power utilities. California's efforts to foster competition between utility monopolies had begun after the energy crises of the 1970s. *See* Duane, *supra*, at 482-87. Federal law then allowed a "qualifying small power production facility" to compete in wholesale power markets. *See* Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95-617, §§ 201, 210, 92 Stat. 3117, 3134-35, 3144-47 (codified at 16 U.S.C. §§ 796(17)(C), 824a-3). California pursued these new options particularly aggressively so that, by 1991, California received a third of its energy from producers other than the monopolies held by local utilities. HIRSH, *supra*, at 93. Those producers demonstrated that a utility could efficiently produce power without taking advantage of economies of scale that supposedly made electricity monopolies "natural." Through these reforms and market changes, the monopoly status of local utilities and the methodology of state regulation of monopoly utilities was eroding.

California A.B. 1890, passed in 1996, sought to accelerate this breakup of local utility monopolies by requiring them to divest a substantial amount of their electricity generation facilities. Act of Sept. 23, 1996, ch. 854, 1996 Cal. Legis. Serv. 854 (West). Local utilities also were required to sell power generated by remaining facilities to the California Power Exchange Corporation (CalPX), which was to serve as

an auction market for wholesale electricity sales. *Lockyer*, 383 F.3d at 1008-09.[11]

## C. Shifting Authority to FERC

When combined with federal preemption law, one crucial result of these energy market regulatory reforms has been "a massive shift in regulatory jurisdiction from the states to the FERC." Gentile, *supra*, at 373. As noted, a "bright line" exists between state and federal jurisdiction, with wholesale power sales — the type of sales at issue in the challenged contracts in this case — falling on the federal side of the line. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986) (quoting *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964)). FERC's jurisdiction to determine the reasonableness of wholesale rates is exclusive. *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988). Prior to 1996, vertically-integrated state monopolies would charge public consumers rates regulated by state entities and would purchase power from interstate utilities at rates regulated by FERC. The 1996 FERC reforms opened up local monopolies to competition among suppliers in the wholesale power market, resulting in a sharp increase in wholesale power sales — subject to FERC's exclusive jurisdiction — as utilities shopped among suppliers. *See* Gentile, *supra*, at 373; *Pub. Util. Dist. No. 1 v. Idacorp Inc.* (*Grays Harbor*), 379 F.3d 641 (9th Cir. 2004). Additionally, state regulatory reform laws, like California's A.B. 1890, resulted in a less active role for state regulators and a more active one for FERC, as the breakup of vertically integrated utilities created the need for many more wholesale transactions. In California, for example, regulators "ceded most of their authority for regulating generator or trader behavior to FERC through A.B. 1890." Duane, *supra*, at 507.

---

[11]The details of A.B. 1890 are discussed below.

The upshot of these federal and state innovations in electricity regulation is that state regulators, despite their continued authority over rates charged directly to consumers, have much less actual authority over those rates than they did when *Mobile* and *Sierra* were decided. Local utilities now obtain power largely through wholesale contracts subject to FERC's exclusive regulation, rather than through self-generated and self-transmitted power. As a result, state regulators ordinarily must set retail rates with the wholesale rates as an established cost factor. FERC recognized this dynamic when issuing its reform orders, noting that customers will obtain more power delivered via "unbundled" wholesale transactions — in which the generation and transmission are separately traded rather than provided by an integrated local utility monopoly — making "[t]he exercise of our jurisdiction over rates, terms and conditions of unbundled retail transmission . . . more important." Order 888-A, 62 Fed. Reg. at 12,279.

Accordingly, while the state and federal regulatory reforms of the 1990s did not end regulation of the electric energy industry, they did begin a new regulatory era. Although state regulators formerly took an extremely active role so as to ensure the just and reasonable retail power rates, FERC has exclusive jurisdiction over the wholesale rates that now drive the electric power market and, as a practical matter, largely determine the rates ultimately charged to the public. These changes profoundly affect this case and require us to ensure that FERC's application of the *Mobile-Sierra* doctrine reflects both the historical and regulatory purpose of the doctrine *and* contemporary regulatory reality.

With the history of electric rate regulation thus in mind, we now turn to the facts of the particular contracts at issue and then consider whether FERC applied the correct legal standard to review of these challenged contracts.

### III.   *Factual and Procedural Background*

### A.   The Western Energy Crisis of 2000-2001

This is not the first case, and it will not be the last, that requires this court to address the western energy crisis of 2000-2001, the basic facts of which are outlined elsewhere. *See Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861, 863-66 (9th Cir. 2006); *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1035-46 (9th Cir. 2006); *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 911-14 (9th Cir. 2005); *Lockyer*, 383 F.3d at 1008-11; *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 835-36 (9th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005); *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 800-01 (9th Cir. 2002); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1045-46 (9th Cir. 2001); *Cal. Power Exch. Corp. v. FERC* (*CalPX*), 245 F.3d 1110, 1114-19 (9th Cir. 2001); *see also* Duane, *supra*, at 511-24; Michael A. Yuffee, *California's Electricity Crisis: How Best To Respond to the "Perfect Storm,"* 22 Energy L.J. 65, 65-84 (2001). Accordingly, we summarize here only those facts most relevant to this case.

As noted, in 1996, the California legislature deregulated the power industry in California through passage of A.B. 1890. The bill froze residential and small commercial consumer retail rates[12] and required that the three largest California investor-owned utilities[13] divest most of their electricity generation facilities. *See CalPX*, 245 F.3d at 1114-15. Additionally, the bill created the CalPX, which operated a single-day

---

[12]The legislature froze rates at a level utilities expected to be far above rates utilities were likely to have to pay, thus allowing them to recoup "stranded costs" as California's energy market shifted to a new regulatory era. *See* Duane, *supra*, at 501.

[13]The three largest investor-owned utilities were San Diego Gas and Electric Company, Southern California Edison, and Pacific Gas and Electric Company (PG&E). *CalPX*, 245 F.3d at 1114.

auction for day-ahead and day-of trading in wholesale electricity, known as the "spot market." *Id.* at 1114.[14]

In the summer of 1999, CalPX also opened up a "forward market" to facilitate long-term wholesale electricity contracts. *Id.* The California Public Utilities Commission, however, allowed the investor-owned utilities to purchase only a limited amount of electricity from the CalPX forward markets. The great bulk of their load still had to be purchased from the CalPX spot markets. *Id.* at 1115.

In the summer of 2000, there was a dramatic spike in the price of wholesale electricity in the spot markets. *Id.* For example, "[t]he CalPX's constrained day-ahead price peaked at $1,099/MWh [megawatts/hour] on June 28, 2000 — an astounding 15-fold increase over the pre-restructuring average cost of $74/MWh." *Id.* at 1115 n.2.

On November 1, 2000, FERC issued an order explaining that, in its view, this dramatic increase was primarily the result of three factors:

*First*, "competitive market forces played a major role in the run-up of prices through significantly increased power production costs combined with increased demand due to unusually high temperatures and a scarcity of available generation resources throughout the West and California in particular." *San Diego Gas & Elec. Co.*, 93 F.E.R.C. ¶ 61,121, at ¶ 61,354 (2000).

*Second*, "[m]any of the market dysfunctions in California and the exposure of California consumers to high prices can be traced directly to an over reliance on spot markets." *Id.*

[14]The term "spot market" refers to deals for energy provided over periods generally not exceeding 24 hours and entered into the day of or day prior to delivery. It contrasts with the term "forward market," in which energy is delivered some time beyond 24 hours after the sale.

¶ 61,359. The rules requiring investor-owned utilities to purchase primarily through the spot markets precluded any significant reliance on forward markets. "And other retail suppliers who would have been free to implement appropriate risk management strategies could not be induced to participate in California's market because the low retail rate, frozen at 10 percent below historical levels, thwarted competitive opportunities for new participants to enter the market." *Id.*

*Third*, FERC suggested that there was the opportunity for abuse of the markets through the exercise of market power, but could not point to specific instances. *Id.* ¶ 61,376. FERC's staff later issued a report concluding that the spot market was dysfunctional, partially due to market manipulation by sellers; that conclusion is assumed by all parties here. *See* STAFF OF THE FEDERAL ENERGY REGULATORY COMMISSION, FINAL REPORT ON PRICE MANIPULATION IN WESTERN MARKETS: FACT-FINDING INVESTIGATION OF POTENTIAL MANIPULATION OF ELECTRIC AND NATURAL GAS PRICES ["Staff Report"] (2003), *available at* www.ferc.gov/legal/maj-ord-reg/land-docs/PART-I-3-26-03.pdf.

California is part of a single integrated electricity market in the West. Its energy problems therefore created a "dysfunctional marketplace both in California and the remainder of the West." *See San Diego Gas & Elec. Co.* (*June 19 Order*), 95 F.E.R.C. ¶ 61,418, at ¶ 62,556 (June 29, 2001). For example, in the Pacific Northwest, prices have historically averaged approximately $24/MWh. During this period, short term prices spiked to unprecedented levels, peaking at $3,300/MWh in early December of 2000, and during the summer and fall of 2000 averaged between $200/MWh and $500/MWh. Markets were also marked by unprecedented levels of price volatility. In response to this volatility, between August 2000 and December 19, 2001, FERC issued nearly 75 orders providing for spot market mitigation measures, *see, e.g.*, *id.*, most aimed at reducing the size of the spot market. *San Diego Gas*

*& Elec. Co.*, 97 F.E.R.C. ¶ 61,275, at ¶ 62,171 (Dec. 19, d2001).

The order issued on December 15, 2000, is of particular relevance to the issues here. *See San Diego Gas & Elec. Co. (December 15 Order)*, 93 F.E.R.C. ¶ 61,294 (Dec. 15, 2000). That order strongly urged investor-owned utilities to move to long-term contracts of two years or more. *Id.* ¶ 61,993. "To address concerns about potentially unjust and unreasonable rates in the long-term markets," FERC agreed to "monitor prices in those markets" and established a "benchmark" rate of $74/MWh to "use as a reference point in addressing any complaints regarding the pricing of long-term contracts negotiated over the next year." *Id.* ¶ 61,994-95. In response to the contention that such a shift would only transform the forward market into another strong sellers' market resembling the then-dysfunctional spot market, FERC declared that it would "be vigilant in monitoring the possible exercise of market power" in the forward market. *Id.* ¶ 61,994. FERC's monitoring, the agency promised, would "also provide customers protection by providing early review of as-bid prices that may not be just and reasonable and prompt rate relief for prices that are mitigated." *Id.* ¶ 61,997.

## B.   Contracts at Issue Here

This consolidated appeal involves three separate sets of contracts, all of which were made pursuant to the Western Systems Power Pool Agreement (Power Pool Agreement), an umbrella agreement that established standardized terms for wholesale energy transactions. All the utilities involved in this case are signatories to that agreement.

### 1.   *Snohomish*

In response to the extreme spike of spot market prices (reaching as high as $3,300/MWh) during December 2000, Snohomish, a public utility for Snohomish County in Wash-

ington, determined that it was no longer viable to rely on the spot markets. On December 22, 2000, Snohomish issued a request for proposals to 17 power suppliers, seeking bids for one-to-three year contracts, providing a total of approximately 75-100 megawatts of electricity for 2001.

Snohomish received five bids, but two were unresponsive to Snohomish's needs. Of the three responsive bids, no supplier would offer more than 25 MW, so Snohomish accepted all three bids and negotiated contracts with each supplier.[15] That year, Snohomish's Board of Commissioners had previously approved an unprecedented thirty-five percent increase in retail rates, allowing for an average contract price of $125/MWh. Unfortunately, none of the three offers would allow Snohomish to meet this price, and Snohomish chose not to ask its ratepayers for another double-digit rate increase in the same year.

Consequently, Snohomish asked Morgan Stanley — an electrical energy commodities dealer — what term would be necessary to secure a $100/MWh price for its contract; Morgan Stanley demanded a ten-year term. The parties ultimately agreed to a nine-year term at $105/MWh. Additionally, Morgan Stanley required Snohomish to accept credit terms articulated in a contractual provision termed the "Collateral Annex."[16]

Snohomish claims that it suffered losses between January 2001 and March 2002 in excess of $25.7 million and that those losses will escalate over the term of the contract as market rates remain close to traditional levels. FERC specifically

---

[15]One of the three contracts, signed with Enron Corporation, was terminated in November 2001, as Enron's credit deteriorated. Snohomish sought reform of the other contract, with American Electric Power, and the parties settled that case. The remaining contract, here at issue, is with Morgan Stanley Capital Group ("Morgan Stanley").

[16]Among other requirements, the "Collateral Annex" required Snohomish to post, on two days notice, specified collateral. This requirement has required Snohomish to post as much as $101 million in collateral.

found that the Morgan Stanley contracts accounted for an eight percent increase for retail ratepayers over 2001 rates, and other contracts accounted for a fifty-one percent increase. *Nev. Power Co.* (*November 10 Order*), 105 F.E.R.C. ¶ 61,185, at ¶ 61,986 (Nov. 10, 2003). Snohomish here challenges the term of the contract and the imposition of the Collateral Annex.

### 2.    *Southern Cal Water*

Southern Cal Water owns and operates an electric utility distribution system that serves approximately 21,600 customers in San Bernadino County, California. Southern Cal Water purchases, subject to regulation by the California Public Utilities Commission, an average electric load of about 16.3 MW.

The A.B. 1890 requirements that investor-owned utilities purchase in the spot market did not apply to Southern Cal Water, which owned no transmission lines and generated no electricity. To avoid relying entirely on the spot markets, which it viewed as significantly risky, Southern Cal Water executed a one-year contract with Illinova in April 1999, providing for purchase of 12 MW of uninterruptible around-the-clock energy at a price of $28/MWh. One year later, Southern Cal Water renewed the contract with Dynegy (Illinova's successor), to run from May 1, 2000, to May 1, 2001, for the same load, at the increased price of $35.50/MWh.

California enacted A.B. 1 on February 1, 2001, allowing the California Department of Water Resources to purchase energy for the then-collapsing large investor-owned utilities and power suppliers. *See* Act of Feb. 1, 2001, 2001 Cal. Legis. Serv. 1st Ex. Sess. 4 (West). At that point, Dynegy informed Southern Cal Water that it was not interested in renewing its contract with Southern Cal Water, because it could sell its entire generation output to the State of California. With the present contract expiring at the end of April

2001, Southern Cal Water engaged in a hurried bidding process.[17]

On March 7, 2001, Southern Cal Water issued a request for proposals for 15 MW of power to six power companies operating in California and requested bids by March 14, 2001. The company requested bids of one to seven years, without specifying a preferred or maximum price. The three bids submitted ranged from $194.50/MWh for a one-year contract to $84/MWh for a seven-year contract. After receiving firm offers at higher prices, Southern Cal Water accepted Mirant's offer of $95/MWh for five years, as the offer that best balanced price against contract length. In light of this increase in Southern Cal Water's wholesale electricity costs, the California Public Utilities Commission allowed the company to recover a portion of the costs of the contract, resulting in a weighted average retail rate of $77/MWh.

Southern Cal Water maintains that its ratepayers have seen an overall thirty-eight percent increase in their electric bills. FERC found that there was no rate increase for Southern Cal Water's ratepayers who are permanent residents, and that the other group of Southern Cal Water ratepayers, those with second homes in certain areas, paid an average monthly electric bill of only $35.13. *Order on Rehearing*, 105 F.E.R.C. at ¶ 61,986.

---

[17]Noting that, in October 2000, Southern Cal Water rejected an offer by Dynegy to extend its contract on a "blend and extend" basis of between $46.50/MWh to $54.50/MWh depending on the length of the proposed contract, *Order on Rehearing*, 105 F.E.R.C. at ¶ 61,988 (internal quotation marks omitted), FERC found that Southern Cal Water *chose* to wait until March 2001 to solicit bids. This statement is misleading. Southern Cal Water could only have become aware that Dynegy would not renew its contract on any terms because of the disincentive to doing so created by A.B. 1 after that law was passed, which was in February of 2001. As noted above, it was Dynegy's pullout that induced Southern Cal Water's frenzied bidding process.

### 3. *Nevada Power Companies: Nevada Power and Sierra Pacific*

The challenge brought by Nevada Power and Sierra Pacific seeks to modify over two hundred forward market contracts with various energy sellers for supply of 25-100 MW blocks of power.[18] These contracts range in price from $33/MWh to $290/MWh, and were entered into in 2000-2001 with ten energy companies. FERC found that these contracts were standard products arranged through independent third-party brokers, and concluded that Nevada Power and Sierra Pacific were price-takers, meaning that those utilities took the price the market yielded rather than bargaining or demanding a certain price. *Nev. Power Co.* (*June 26 Order*), 103 F.E.R.C. ¶ 61,353, at ¶ 62,398 (June 26, 2003). According to FERC, the Nevada companies did not pursue purchase of a diverse mix of products and therefore failed to hedge the risk that spot market prices might fall. *Id.*

FERC also found that the Nevada companies pursued an aggressive procurement strategy, purchasing more power than necessary to serve the expected load of their local customers. *Id.* FERC suggests that the Nevada companies were trying to buy as much power as they could before sellers discovered their precarious financial situation. *Id.*

FERC found that if these contracts are not modified, the resulting increase to ratepayers would be no more than five percent. *Id.* ¶ 62,397. The Nevada companies recognize that the retail rates have decreased since they agreed to the challenged contracts, but they maintain that Nevada customers will still pay significantly more than they would pay if the contracts were modified to reflect just and reasonable rates. *Order on Rehearing*, 105 F.E.R.C. at ¶ 61,986. Nevada Power

---

[18]The Nevada companies recently settled their disputes with Morgan Stanley, El Paso Merchant Energy, and Enron Power Marketing. These settlements have no bearing on the legal issues we address.

and Sierra Pacific therefore seek to modify their contracts with the energy sellers. *Nev. Power Co.* (*April 11 Order*), 99 F.E.R.C. ¶ 61,047, at ¶ 61,185 (Apr. 11, 2002). Nevada Power is seeking relief for contracts that had not yet gone to delivery at the refund effective dates set by FERC (between late January and April of 2002, depending on docket number).[19] *Id.* ¶¶ 61,185, 61,192.

---

[19]Upon setting a section 206 complaint for hearing, FERC establishes a "refund effective date," which is a date establishing the period from which complainants may attain relief should the proceedings extend beyond that established date. In other words, if a party makes a complaint on January 1, 2004, but FERC does not set the complaint for hearing until July 1, 2004, FERC may establish a "refund effective date" of March 1, 2004, so that the complainant will not suffer from the agency's delay or from continued agency proceedings.

**Volume 2 of 2**

### C.   Agency Proceedings

The agency actions challenged here arise from a series of orders issued by FERC with regard to the complaints filed by the local utilities.

1.   *Order Setting the Local Utilities' Complaints for Hearing (April 11 Order)*

On April 11, 2002, pursuant to section 206 of the FPA, FERC set a hearing concerning the contracts "entered into during the time period from November 1, 2000 through June 20, 2001, and that have not yet concluded," because FERC has "no authority to order refunds for contracts or transactions that conclude prior to the refund effective date." *Id.* ¶ 61,191 (footnote omitted). FERC also set refund effective dates for each of the complaints. *Id.* ¶ 61,192.

FERC explained in its April 2002 order that it did not have enough information yet to address the *Mobile-Sierra* issues definitively. The agency clarified that "[f]or all but one of the contracts identified by the complainants, Section 6.1 of the umbrella [Power Pool] agreement appears to be the only specific contractual provision which may affect parties' rights to make changes to contracts." *Id.* § 61,190. The remaining contract, between PUD and Morgan Stanley, has a separate provision addressing both FPA sections 205 and 206. *Id.* ¶ 61,190 & n.11. FERC also noted a key dispute between the parties: whether the "spot markets had an adverse effect on the long-term, bilateral markets in California, Nevada and Washington." *Id.* ¶ 61,191. The hearing, designed to illuminate these questions, was to address "whether the dysfunctional California spot markets adversely affected the long-term bilateral markets, and, if so, whether modification of any individual contract at issue is warranted." *Id.* (footnote omitted). FERC specifically excluded "issues concerning the Commission's policies on granting market-based rate authority or on regulation of sellers with such authority." *Id.*

2. *Initial Decision of the Administrative Law Judge (Initial Decision)*

On December 19, 2002, after an extensive hearing, Administrative Law Judge Carmen Cintron issued a lengthy initial decision on the complaints. *Nev. Power Co.*, 101 F.E.R.C. ¶ 63,031 (Dec. 19, 2002). She ultimately concluded that (1) the *Mobile-Sierra* "public interest" standard is the applicable standard of review, *id*. ¶ 65,277, and (2) the complainants failed to demonstrate that the spot market sufficiently adversely affected the forward market to merit revision of the contracts under the *Mobile-Sierra* doctrine, *id*. ¶ 65,295.

3. *Order on Initial Decision*

On June 26, 2003, FERC issued a lengthy opinion in which it affirmed the Initial Decision. *Order on Initial Decision*, 103 F.E.R.C. at ¶ 62,400. FERC's primary findings included: (1) Section 6.1 of the Power Pool agreement's express reservation of joint modification under section 205 of the FPA impliedly waived the right to seek unilateral modification, *id*. ¶ 62,388; (2) this waiver meant that review was limited to the *Mobile-Sierra* "public interest" standard, *id*. ¶¶ 62,388-89; (3) applying the three factors articulated in *Sierra* and considering "the totality of the circumstances," complainants failed to meet the "public interest" standard because "[t]he fact that a contract becomes uneconomic over time does not render it contrary to the public interest," *id*. ¶ 62,384; and (4) the totality of the circumstances evidence analyzed by the ALJ further demonstrated that "the challenged transactions were the result of [the local utilities'] voluntary choices," and there was "no evidence of unfairness, bad faith, or duress in the original negotiations," *id*. ¶¶ 62,399-62,400. Because modification was therefore not warranted, FERC denied the complaints. *Id.* ¶ 62,400.

Although FERC acknowledged that it had set the ALJ hearing in large part to decide "whether the dysfunctional Califor-

nia ISO and PX spot markets adversely affected Western long-term bilateral markets," *Id.* ¶ 62,385, FERC concluded that evidence showing the spot market's effect on the forward market — including that reviewed in the Staff Report[20] — "would be relevant to contract modification only where there is a 'just and reasonable' standard of review." *Id.* ¶ 62,397. FERC further explained, applying the *Mobile-Sierra* public interest standard, that "to justify contract modification it is not enough to show that forward prices became unjust and unreasonable due to the impact of spot market dysfunctions; it must be shown that the rates, terms, and conditions are contrary to the public interest," a showing the local utilities failed to make. *Id.*

Commissioner Massey issued a vigorous dissent, disagreeing with all of the Commission's major findings and analysis. He explained that "[o]ur primary calling under the Federal Power Act is to ensure that prices are just and reasonable 24 hours a day, seven days a week." *Id.* ¶ 62,403 (Massey, Comm'r, dissenting). Furthermore, even under a "public interest" standard, which he maintained was not applicable to these contracts, Commissioner Massey determined there was

> simply no persuasive public interest rationale for protecting and sanctifying contracts negotiated in this unprecedented and extraordinary environment. . . . It would simply defy logic to conclude that the high prices in these contracts were not adversely influenced by market conditions that included the exercise of market power and widespread market manipulation.

*Id.* ¶ 62,408.

---

[20]FERC at first stated that it "t[ook] into consideration the findings of the Staff Report," Order on Initial Decision, 103 F.E.R.C. at ¶ 62,396, but later stated its conclusion that those findings were not "relevant" under *Mobile-Sierra*, the standard FERC determined appropriate. *Id.* ¶ 62,397.

### 4.   *Order on Requests for Rehearing and Clarification*

Complainants applied for rehearing. On November 10, 2003, FERC reaffirmed its previous holdings. *Order on Rehearing*, 105 F.E.R.C. at ¶ 61,980. FERC, however, revised its previous factual findings to recognize that the customers of Snohomish and Southern Cal Water did experience a retail rate increase. FERC concluded, however, that these increases either were not significant or were not pertinent, because the local utilities did not prove the cause of the increases. *Id.* ¶¶ 61,986-87. FERC also rejected petitioners' claims that two of the Commissioners violated procedural requirements and the Sunshine Act by engaging in ex parte communications. *Id.* ¶¶ 61,991-94. The local utilities then filed this petition for review of FERC's decision.

We review FERC's orders to ensure that they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review de novo the question whether FERC complied with and understood its statutory mandate. *City of Fremont v. FERC*, 336 F.3d 910, 914 (9th Cir. 2003); *Am. Rivers v. FERC*, 201 F.3d 1186, 1194 (9th Cir. 2000). We "defer to the Commission's interpretations of the statutory provisions it administers, but we remain 'the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.' " *Am. Rivers*, 201 F.3d at 1194 (quoting *Natural Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir. 1999). FERC's factual findings are conclusive so long as they are "supported by substantial evidence." 16 U.S.C. § 825*l*(b).

## IV.   *Prerequisites To Applying* **Mobile-Sierra**

**[1]** As explained above, there is but one statutory standard addressing the lawfulness of wholesale electricity rates. That standard requires that *all* rates be "just and reasonable." While

there is language in some cases suggesting otherwise,[21] we are convinced that *Mobile-Sierra* establishes one means of review under the just and reasonable standard, applicable in certain limited circumstances. The statute will admit of no other conclusion, and the Supreme Court case law supports it.

*Sierra* framed its analysis as a determination as to whether the Federal Power Commission met its "condition precedent" to a section 206 remedy, a "finding that the existing rate is 'unjust, unreasonable, unduly discriminatory or preferential.' " 350 U.S. at 353. It then faulted the Commission's finding that the established rate was invalid *not* because it applied the usual section 206(a) "unreasonable" standard, but because "the Commission holds that the contract rate is unreasonable solely because it yields less than a fair return on the net invested capital." *Id*. at 354-55. As the *Sierra* Court explained,

> [W]hile it may be that the Commission may not normally *impose* upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. . . . [T]he purpose of the power given the Commission by § 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities . . . . When § 206(a) is read in the light of this purpose, it is clear that a contract may not be said to be either 'unjust' or 'unreasonable' simply because it is unprofitable to the public utility.

---

[21]*Boston Edison Co.*, 233 F.3d at 65, for example, refers to *Mobile-Sierra* as establishing a "public interest standard," separate from the statutory just and reasonable requirement, and referring to that standard as having been "created out of whole cloth."

*Id*. at 355. *Sierra*, then, simply held that considerations as to what is "unjust" or "unreasonable" differ in the context of an established bilateral contract, not that the statutory standards no longer govern. The Supreme Court confirmed this understanding in *Verizon*, explaining that "[i]n wholesale markets, the party charging the rate and the party charged were often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them." 535 U.S. at 479.

Beginning with that understanding of *Mobile-Sierra*, we turn to the limited circumstances in which its presumption applies. Although no case has outlined these conditions succinctly, we derive three prerequisites from the context of *Mobile-Sierra* and from later cases employing the doctrine.

## A.   Contractual Waiver

[2] As an initial matter, the contested contract by its own terms must not preclude the limited *Mobile-Sierra* mode of review. *See Texaco Inc. v. FERC* (*Texaco II*), 148 F.3d 1091, 1096 (D.C. Cir. 1998); *Ne. Utils. Serv. Co. v. FERC* (*Ne. Utils. I*), 993 F.2d 937, 960 (1st Cir. 1993). *Mobile-Sierra* presumes that private parties have negotiated an agreement that they view as just and reasonable over the time period covered. If, by the very terms of their agreement, the parties indicate otherwise, FERC cannot assume the mutual satisfaction of the parties.

For example, parties can include in a contract an express reservation of a right to make changes unilaterally, known as a "*Memphis* clause." *See United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 105, 112 (1958). Such a clause will preclude application of the *Mobile-Sierra* presumption. The rationale for enforcing such clauses is that if the contract does not settle rates as between the parties for the term of the agreement or call for limited, *Mobile-Sierra*

review, then application of *Mobile-Sierra* does not stabilize or protect the sanctity of contract. *See id.* at 112 (noting that the "decisive difference" between *Memphis* and *Mobile* was that "in *Mobile* one party to a contract was asserting that the Natural Gas Act somehow gave it the right unilaterally to abrogate its contractual undertaking, whereas here petitioner seeks simply to assert, in accordance with the procedures specified by the Act, rights *expressly reserved* to it by contract") (emphasis added). In other words, *Mobile-Sierra* serves to protect contracts from unilateral change, but that purpose is not served when the parties expressly have permitted such change.

## B.  Regulatory Context

Even if it is established that the parties contracted with the intent that *Mobile-Sierra* apply, a further barrier remains: The regulatory context in which the contracts were initially formed must provide a sound basis to believe that the resulting rates are just and reasonable. Absent such assurances, FERC's reliance on the presumption would amount to a complete abdication of its statutory responsibility under the FPA. As the following sub-sections explain, two related conditions operate to ensure that a foundation for the presumption exists: (1) timely and procedurally effective review of rates — which in the contemporary regulatory regime can be limited to review of a utility's market-based rate authority in the first instance, and (2) meaningful substantive standards for review of the circumstances of contract formation.

### 1.  *Timely and Effective Review of Rates*

To justify the *Mobile-Sierra* mode of review, the regulatory scheme in which the contracts are formed must provide FERC with an opportunity for initial review of the contracted rate. In *Mobile* and *Sierra*, for example, the rates had been submitted to the agency previously under section 205 and allowed to remain in effect. *See Mobile*, 350 U.S. at 336; *Sierra*, 350 U.S. at 352. Such an initial review is an important precondi-

tion to *Mobile-Sierra* because, as FERC has explained, apply-
ing the doctrine in "first review cases would mean that '[the
agency's] ability to protect the public interest would be negli-
gible and public regulation would consist of little more than
rubber-stamping private contracts.' " *Potomac Elec. Power
Co. v. FERC* (*PEPCO*), 210 F.3d 403, 409 (D.C. Cir. 2000)
(quoting *Ne. Utils. Serv. Co.*, 66 F.E.R.C. ¶ 61,332, at
¶ 62,087 (1994), *aff'd,* 55 F.3d 686 (1st Cir. 1995)); *see also
PEPCO,* 210 F.3d at 406 (noting that challenged contracts
had "been found to be just and reasonable when originally
approved" by FERC).

**[3]** Consistent with its previous rulings, FERC concedes
here that an opportunity for initial review of whether a rate is
just and reasonable is necessary for *Mobile-Sierra* to apply.
The Intervenor-Respondents, however, cite to a thirty-year
old D.C. Circuit decision, *see Borough of Lansdale v. Fed.
Power Comm'n*, 494 F.2d 1104, 1112-14 (D.C. Cir. 1974),
and argue that an opportunity for initial review is *not* neces-
sary to trigger the *Mobile-Sierra* presumption. We disagree.

The analysis in *Lansdale* is not applicable to this case. In
*Lansdale*, a seller, joined by the Commission, sought to
ignore a rate in a contract to which it had previously agreed
but which it had not properly filed with the Commission, and
instead file a higher rate, "as if the contract had never been
negotiated." *Id.* at 1112; *see also id.* at 1107-08. The D.C.
Circuit refused to allow this unilateral revision of an agree-
ment, holding that the Commission could not permit the
higher rate of the second contract to go into effect unless and
until it found that the original rates were unlawful. *See id.* at
1117.

*Lansdale* did not allow the seller to "convert its statutory
duty to file into a vehicle for breaching the 1971 contract with
Lansdale." *Id.* at 1112. In other words, *Lansdale* focused on
whether *Mobile-Sierra* review allows the adoption of a *second*
contract with a higher rate when the first was never correctly

filed with the Commission. As such, *Lansdale* primarily reflected concern over a seller's abuse of the rate-filing requirement. *Lansdale* did *not* decide, because the question was not before it, that the *Mobile-Sierra* presumption always applies to the filing of an initial rate, regardless of the circumstances.

In this case, the answers to the questions presented turn in part upon whether *Mobile-Sierra* applies to the rate *first* set in a contract entered into under a seller's market-based rate authority, rather than only to a later challenge maintaining that earlier-established rates are *no longer* just and reasonable. The local utilities do not maintain that the original contract is void because it was never filed, but rather that the rates set were unjust and unreasonable when established and should be modified. *Lansdale*'s position that a seller may not profit by failing properly to file a rate-setting contract it freely entered into is hardly remarkable, but is also not particularly pertinent to the questions at issue here.

Indeed, just a year before *Lansdale* was decided, the Supreme Court recognized the importance of an opportunity for an initial just and reasonableness review to the overall statutory scheme. In *Federal Power Commission v. Texaco, Inc.* (*Texaco I*), 417 U.S. 380 (1974), the Court struck down an indirect regulatory scheme adopted by the Commission that would have provided a "blanket certificate procedure for small producers of natural gas." *See id.* at 382, 395. One of the primary reasons for the decision was that "[t]here was no finding that these contemplated increased rates for flowing gas would be just and reasonable. The Commission merely asserts in its brief here that it was familiar with the existing contracts and must have considered the rates reserved to be acceptable under the Act." *Id.* at 396.

In short, FERC is correct to recognize that the *Mobile-Sierra* doctrine apples only if a newly-entered contract

remains in effect *after* there is an opportunity for plenary, "just and reasonable" agency review.

### 2. *Meaningful Review of the Circumstances of Contract Formation*

**[4]** Not only must FERC have an opportunity for *some* initial review of rates, but the scope of that review must permit consideration of the factors relevant to the propriety of the contract's formation. *See Atl. City Elec. Co., 295* F.3d at 14 (holding that *Mobile-Sierra* applies "assuming that there was no reason to question what transpired at the contract formation stage") (citing *Town of Norwood v. FERC*, 587 F.2d 1306, 1312 (D.C. Cir. 1978)). The original premise of *Mobile-Sierra* was that as long as the rate was just and reasonable when the contract was formed, there would be a presumption — based on both the need to protect stability of contract and the likelihood that market participants entering into long-term contracts can protect their own interests — that the reasonableness continued throughout the term of the contract. *See Verizon*, 535 U.S. at 479 ("In wholesale markets, the party charging the rate and the party charged were often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them."). In the present regulatory regime, these relevant factors focus on whether the original negotiations occurred in a functional marketplace such that we may presume the contracted rates were originally just and reasonable.

## V.   *Application of* **Mobile-Sierra**

## A.   **Contractual Waiver of Section 206 Rights**

Having established the prerequisites to *Mobile-Sierra* review under the current regulatory regime, we address first whether the contracts at issue permit *Mobile-Sierra* review.

In this case, FERC determined that there was no express reservation of unilateral modification. As FERC noted, "[f]or all but one of the contracts identified by the complainants, Section 6.1 of the umbrella [Power Pool] Agreement appears to be the only specific contractual provision which may affect parties' rights to make changes to contracts entered into under the [Power Pool] agreement." *April 11 Order*, 99 F.E.R.C. at ¶ 61,190.[21]

The relevant portion of section 6.1 states:

> Nothing contained herein shall be construed as affecting in any way the right of the Parties to jointly make application to FERC for a change in the rates and charges, classification, service, terms, or conditions affecting [Power Pool] transactions under Section 205 of the Federal Power Act and pursuant to FERC rules and regulations promulgated thereunder.

*Id.* ¶ 61,190 n.10. Applying the interpretive doctrine of *expressio unius est exclusio alterius*,[22] FERC viewed the reservation of *joint* section 205 rights as confirming the parties' intention otherwise to abide by the contractual terms for the time period covered. *Order on Initial Decision*, 103 F.E.R.C. at ¶ 62,388.

---

[21]FERC found that Section 39B of the Snohomish-Morgan Stanley Confirmation Agreement expressly restricts the parties' rights to amend under both FPA sections 205 and 206. *April 11 Order*, 99 F.E.R.C. at ¶ 61,190 & n.11. FERC noted, however, that even if Snohomish could overcome the restriction in Section 39B, it would still be restricted by Section 6.1 of the Power Pool agreement. *Order on Initial Decision*, 103 F.E.R.C. at ¶ 62,389. Because we hold the Power Pool agreement, both standing alone and taking Section 6.1 into account, is consistent with *Mobile-Sierra* review, we have no need to consider Section 39B of the Snohomish-Morgan Stanley Confirmation Agreement.

[22]The Latin phrase means the "express[ion] or inclu[sion of] one thing implies the exclusion of the other." BLACK'S LAW DICTIONARY 620 (8th ed. 1999).

**[5]** "FERC is entitled to some deference in construing contracts where the sales are subject to FERC regulation." *Boston Edison*, 233 F.3d at 66 (citing *Memphis*, 358 U.S. at 114); *see also City of Seattle v. FERC*, 923 F.2d 713, 716 (9th Cir. 1991) (granting FERC deference in the interpretation of contracts). With or without that deference, we agree with FERC that these contracts do not preclude *Mobile-Sierra* review, but we do not rely on the *expressio unius* precept in so concluding. Instead, like the D.C. Circuit in *Texaco II*, 148 F.3d at 1096, we hold that private long-term contracts can be *generally* governed by *Mobile-Sierra* if such review is otherwise appropriate, unless there is a specific indication in the contract that section 205 or 206 rights have been reserved.

*Texaco II* considered a boilerplate clause that said that the contract "shall comply with all applicable laws, statutes, ordinances, safety codes and rules and regulations of governmental authorities having jurisdiction." *Id.* The D.C. Circuit held that such a general clause does not reserve compliance with section 206 standards. In so deciding, the D.C. Circuit stated, in essence, a default rule, explaining: "The law is quite clear: absent contractual language 'susceptible to the construction that the rate may be altered while the contract[ ] subsist[s],' the *Mobile-Sierra* doctrine applies." *Id.* (alterations in original) (quoting *Appalachian Power Co. v. Fed. Power Comm'n*, 529 F.2d 342, 348 (D.C. Cir. 1976)). After *Texaco II*, the prevailing rule of contract interpretation with regard to the preservation of limited *Mobile-Sierra* review, according to the First Circuit, is that general statements that the law will "*otherwise* be binding" do not "negate the ordinary, default rule that *Mobile-Sierra* govern[s] FERC-proposed changes." *Boston Edison*, 233 F.3d at 67 (citing *Texaco II*, 148 F.3d at 1096).

The trio of authorities cited by the local utilities, all from the D.C. Circuit and all pre-*Texaco II*, are not inconsistent with this interpretive principle. *See Union Pac. Fuels, Inc. v. FERC*, 129 F.3d 157 (D.C. Cir. 1997); *Papago Tribal Util.*

*Auth. v. FERC*, 723 F.2d 950 (D.C. Cir. 1983); *Kansas Cities v. FERC*, 723 F.2d 82 (D.C. Cir. 1983). In two of these cases, the court inferred an intent to permit full FERC review from a provision restricting review in narrow circumstances. *See Papago*, 723 F.2d at 954; *Kansas Cities*, 723 F.2d at 86-90. To infer from a narrow restriction on *unilateral* changes an intent otherwise to allow such changes, as *Kansas Cities* and *Papago* permitted, is quite different from inferring from a narrow authorization of *joint* authority to make changes an intent to allow *unilateral* changes, as the local utilities here insist FERC was required to do.

By contrast with *Papago*, *Kansas Cities*, and this case, the disputed contracts in *Union Pacific Fuels* did include a *Memphis* clause. *See Union Pac. Fuels*, 129 F.3d at 161. The contracts, however, also included a clause restricting the ability of the parties to seek a change to the "modified fixed variable rate design." *Id.* (internal quotation mark omitted). In these unusual circumstances, the D.C. Circuit upheld FERC's order requiring a provider to file proposed changes to its rate structure under section 5 of the Natural Gas Act despite that narrow restriction and noted:

> Nothing in the contracts expressly exempted the private agreement from rate changes initiated by FERC under NGA § 5. . . . While Petitioners protest that boilerplate language acknowledging rate changes by FERC should not render [the] *Mobile-Sierra* doctrine inapplicable, . . . they do not explain why they could not have adopted language that would simply and clearly have invoked *Mobile-Sierra*.

*Id.* at 161-62. *Texaco II*, issued by the same court a year later, explained that this language in *Union Pacific Fuels* does not have application beyond the situation there presented, in which the contract contains a clause that does, generally, negate the default *Mobile-Sierra* rule. *See Texaco II*, 148 F.3d at 1096 (noting that in *Union Pacific Fuels*, the court "*inad-*

*vertently* lent support to the inference" that absent express language *invoking Mobile-Sierra*, FERC ordinarily is free to review rates without regard to the *Mobile-Sierra* presumption (emphasis added)).

**[6]** We agree with the D.C. and First Circuits that the *Mobile-Sierra* presumptions are, in essence, self-executing. Adoption of a *Memphis* clause permitting a party to an energy contract to modify its terms unilaterally demonstrates that the parties were not seeking to establish the stability of energy contracts the *Mobile-Sierra* doctrine seeks to foster. Absent such a clause, the *Mobile-Sierra* balance between preserving the stability of private contracts and protecting the public interest in just and reasonable rates prevails. Preserving *joint* modification does not negate the default application of the *Mobile-Sierra* presumption when that presumption is otherwise appropriate, as the *Mobile-Sierra* presumption applies to unilateral, not joint, rate changes. Indeed, parties to energy contracts, like parties to any other contract, are free, by agreement, to vary the terms of the contract mid-term, with or without a prior pact allowing them to do so. When parties to an energy contract do so vary an agreement, sections 205 and 206 apply according to their express terms.

**[7]** We therefore uphold FERC's interpretation of section 6.1 of the Power Pool agreement as reasonable.

## B. Timely and Effective Review of Rates

As the parties intended *Mobile-Sierra* review to apply, we next consider whether, as FERC maintains, its blanket grant of market-based rate authority qualifies as sufficient prior review and approval of all contracts made under that authorization to trigger the *Mobile-Sierra* presumption in any later section 206 challenge. If not, then the contracts here were not subject to "first review" by FERC under the FPA and do not trigger the *Mobile-Sierra* doctrine. We hold that although market-based rate authority *can* qualify as sufficient prior

review to justify limited *Mobile-Sierra* review, it can only do so when accompanied by effective oversight permitting timely reconsideration of market-based authorization if market conditions change.

**[8]** Two fairly recent decisions of this circuit considered the role of market-based rate authority under the FPA. In *Grays Harbor*, we held that a contract entered into during the California energy crisis pursuant to the market-based rate regime was protected under the "filed rate doctrine."[23] *See* 379 F.3d at 651-52. We relied heavily on FERC's contention that the regime offered continued and ongoing oversight and thereby "assured that the market-based rates charged comply with the FPA's requirement that rates be just and reasonable." *Id.* at 651. On that basis, *Grays Harbor* concluded that, "while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, . . . they do not fall outside the purview of the doctrine." *Id.*

**[9]** More recently, we again stressed the need for oversight in a market-based rate regime in holding "that market-based tariffs do not, *per se* violate the FPA." *Lockyer*, 383 F.3d at 1014. *Lockyer* held the initial grant of market-based rate authority alone was not enough to assure just and reasonable rates, as FERC recognized when it "affirmed in its presentation before us that it is *not* contending that approval of a market-based tariff *based on market forces alone* would comply with the FPA or the filed rate doctrine." *Id.* at 1013 (emphasis added). The court clarified further that "a market-based tariff cannot be structured so as to virtually deregulate an industry and remove it from statutorily required oversight." *Id.* at 1014.

---

[23]The filed rate doctrine provides that state law and some federal law (e.g. antitrust) may not be used to strike down a rate subject to FERC's exclusive jurisdiction. *See Grays Harbor*, 379 F.3d at 650; *see also Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1084-86 (9th Cir. 2006) (discussing the filed rate doctrine).

*Lockyer*'s emphasis on the need for continued oversight of contract rates is critically important to our current inquiry. In *Lockyer*, California sought relief under section 205 from rates established by wholesale energy companies (many of whom are Intervenor-Respondents here) while there were dysfunctions in the spot market during the California energy crisis. The Court made the following observation regarding FERC "oversight" at the time:

> Despite the promise of truly competitive market-based rates, the California energy market was subjected to artificial manipulation on a massive scale. *With FERC abdicating its regulatory responsibility*, California consumers were subjected to a variety of market machinations, such as "round trip trades" and "hockey-stick bidding," coupled with manipulative corporate strategies, such as those nicknamed "Fat-Boy," "Get Shorty," and "Death Star."

*Id.* at 1014-15 (emphasis added) (footnotes omitted). Under these circumstances, the court concluded, "[t]o cabin FERC's section 205 refund authority . . . would be manifestly contrary to the fundamental purpose and structure of the FPA . . . . The FPA cannot be construed to immunize those who overcharge and manipulate markets in violation of the FPA." *Id.* at 1017.

The requirement of continued oversight in a market-based rate regime applies equally to the section 206 context, and to the application of the *Mobile-Sierra* doctrine in section 206 review. *Lockyer* flatly stated that the FPA does not allow a market-based regime absent "implied enforcement mechanisms sufficient to provide substitute remedies for the obtaining of refunds for the imposition of unjust, unreasonable and discriminatory rates." *Id.* at 1016. Furthermore, *Lockyer* indicates that even in a properly approved market-based rate regime, section 206 remedies are still fully available. *See id.* at 1017 (noting that the "only remedies [under section 206] are prospective").

**[10]** Taken together, these recent circuit decisions support the following conclusion: Market-based rate authority provides a meaningful opportunity for prior review and approval of rates under the FPA, an essential prerequisite to the *Mobile-Sierra* mode of rate review, *only* insofar as FERC implements and uses an effective oversight mechanism *after* the market-based rate authorization is initially granted. Only then can FERC meet its statutory duty to ensure that *all* rates are "just and reasonable."

This conclusion is bolstered by the judicial treatment of two similar regimes instituted by FERC in the past. In *Texaco I*, the Supreme Court considered the Federal Power Commission's attempt to utilize a "blanket certificate procedure for small producers of natural gas" that would "relieve[ ] them of almost all filing requirements." 417 U.S. at 382. The Federal Power Commission's rationale was that small producers would be subject to the forces of the market and could therefore only charge what the market would bear. *See id.* at 390. The Federal Power Commission's rationale in *Texaco I* thus was essentially the same as FERC's rationale here: That case's "small producers," like the market-based rate authority producers here, were asserted to lack market power and were therefore authorized to set rates with no further oversight. The assumption was that the rates set would necessarily be competitive and would therefore tend to reflect the cost of production, including the cost of attracting investment.

The Court affirmed that such a system of "indirect regulation" was permissible under the Natural Gas Act, *see id.*, but struck down the order because it did not sufficiently assure *oversight* to meet the statutory requirement of "just and reasonable" review. *See id.* at 395-96. The Court so held despite the FPC's assurances that it would review the prices of contracts made pursuant to this authority, *see id.* at 396-97, stating:

> [W]e should also stress that in our view the prevailing price in the marketplace *cannot be the final mea-*

> *sure of "just and reasonable" rates mandated by the Act.* It is abundantly clear from the history of the Act and from the events that prompted its adoption that Congress considered that the natural gas industry was heavily concentrated and that monopolistic forces were distorting the market price for natural gas. . . . In subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could *not* have assumed that "just and reasonable" rates could conclusively be determined by reference to market price.

*Id.* at 397-99 (emphasis added) (footnotes omitted).

The D.C. Circuit followed *Texaco I*'s approach when considering a FERC regulation for the oil industry based on the premise that "competitive market forces should be relied upon in the main to assure proper rate levels." *See Farmers Union*, 734 F.2d at 1490. That court was adamant in holding "FERC's largely undocumented reliance on market forces as the principal means of rate regulation to be . . . misplaced. It is of course elementary that market failure and the control of monopoly power are central rationales for the imposition of rate regulation." *Id.* at 1508 (citing STEPHEN BREYER, REGULATION AND ITS REFORM 15-16 (1982)) (footnote omitted). Indeed, the "fundamental flaw in the Commission's scheme" was that "nothing in the regulatory scheme itself acts as a monitor to see if [competition drives rates into the 'zone of reasonableness'] or to check rates if it does not." *Id.* at 1509.

**[11]** Here, FERC failed to adopt any monitoring mechanism before applying deferential *Mobile-Sierra* review to the challenged contracts. When FERC encouraged the local utilities to purchase power in the forward market, the agency promised to oversee the forward market contracts to ensure their justness and reasonableness. *See December 15 Order*, 93 F.E.R.C. at ¶ 61,994. FERC later held, however, that its approval of energy sellers' market-based rate authority —

long *prior* to the market failures that gave rise to the December 15 Order — allowed it to apply the *Mobile-Sierra* doctrine without any direct inquiry into whether the resulting rates were in fact "just and reasonable," and also without any inquiry into the actual state of the market at the time contracts were negotiated. *See Order on Initial Decision*, 103 F.E.R.C. at ¶ 62,388-89.

In light of the foregoing discussion, we must answer the crucial question: Did FERC provide sufficient oversight for contracts made under market-based rate authority to ensure that the resulting rates were within the statutory "just and reasonable" range in the first instance, thereby permitting reliance on the *Mobile-Sierra* doctrine as to the continuing effectiveness of those contracts? We hold that it did not.

FERC asserted in its Order on Initial Decision that the grant of market-based rate authority *is* sufficient predetermination, so that it was "not required specifically to review each agreement" made pursuant to the grant of market-based rate authority. *Id*. ¶ 62,389. In other words, FERC contends that because it requires, before granting market-based rate authority, a showing of lack of market power and regular reporting, it has therefore fulfilled its oversight role, and no further oversight is necessary. FERC asserted the same position on rehearing, maintaining that its decision in *Lockyer* supports that result. *Order on Rehearing*, 105 F.E.R.C. at ¶ 61,982-83.

In FERC's *Lockyer* decision, the agency held that once market-based rate authority is granted, additional oversight is a "compliance issue." *California ex rel. Lockyer*, 99 F.E.R.C. ¶ 61,247 at ¶ 62,063 (2002); *see also Lockyer*, 383 F.3d at 1015. We rejected this aspect of FERC's *Lockyer* decision, however, because without active oversight, "effective federal regulation is removed altogether." *Lockyer*, 383 F.3d at 1015. We reject FERC's reliance on that same proposition as a pillar of FERC's invocation of the *Mobile-Sierra* mode of review in this case.

**[12]** FERC's position here, as in *Lockyer*, is that it fulfills its monitoring obligation by imposing on sellers with market-based rate authority the requirement that they file Quarterly Transaction Reports, make the Reports available for public review, and submit data on a triennial basis to confirm the continued lack (or mitigation) of market power. This data collection activity, however, was insufficient to fulfill FERC's statutory obligation with respect to the contracts challenged here. As demonstrated by what actually happened during the California energy crisis, this sporadic data collection approach is pragmatically unlikely to expose in a timely manner the impact of market changes — in this instance, the impact on the forward market of acknowledged severe market changes within the dysfunctional spot market. That such impacts can occur without affecting FERC's continuing approval of market-based rate authority undercuts FERC's assertion that initial just and reasonableness review occurred with regard to the challenged contracts sufficient to trigger the *Mobile-Seirra* mode of review.

In particular, the quarterly reporting requirement, standing alone, permits review of the grounds for market-based rate authority only with regard to contracts entered into *after* the impact of the market dysfunction or market power on long-term bilateral contracts has already occurred, affecting the likelihood that the contracts in fact set rates within the statutory "just and reasonable" range. There is a crucial difference between this review — that is, purely prospective review, affecting only future contracts — and one that permits consideration of the market conditions at the time a challenged forward contract was entered. *See El Paso Elec. Co.*, 108 F.E.R.C. ¶ 61,071, at ¶ 61,370 n.10 (2004) ("A revocation of market-based rates . . . would not void contracts that parties may have signed . . . ."). The latter kind of remedy is the kind the local utilities ask for here: They seek *modification* of the contracts here at issue, prospectively from the refund effective date but based on the market circumstances that prevailed at the times the contracts were negotiated.

A hypothetical explains the dilemma with FERC's present "oversight scheme": Seller A receives market-based rate authority in Year 1. In Year 5, prices increase dramatically in short-term markets. Buyer B, needing to escape these markets, agrees to long-term contracts X, Y, and Z to buy wholesale energy from Seller A. Buyer B agrees to the contract terms because in a frantic market Seller A is one of the only suppliers willing to enter into a long-term contract, and Buyer B needs to ensure that its supply is able to meet the load required by its retail customers. In its next required quarterly report in Year 6, Seller A dutifully transfers the proper information about its rates to FERC. FERC — perhaps reviewing contracts X, Y, and Z — discovers that the assumption of a functioning market underlying its approval of market-based rate authority for Seller A does not accord with the rates being charged in forward contracts generally, or in those entered by Seller A in particular. FERC therefore revokes Seller A's market-based rate authority. FERC's action, however, will do nothing to reform those troubling contracts.

The problem raised by this hypothetical is that FERC has *no* opportunity to review whether contracts X, Y, and Z are just and reasonable before they are entered. As FERC recognizes, revocation of market-based rate authority in Year 6 in the above hypothetical can only provide relief for contracts made thereafter. *See id.* If a contract is entered into in Year 5, FERC cannot consider whether the basis for market-based rate authority had so atrophied by this time that the economic basis for assuming the rates established would be within the statutorily mandated "just and reasonable" range had evaporated. Instead, FERC applies the most-forgiving version of review, the *Mobile-Sierra* presumption that long-term bilateral contracts will reflect just and reasonable rates, without *any* opportunity for initial review of such contractual rates, whether cost or market based.

This case is precisely parallel to the above hypothetical. For example, Enron, an Intervenor-Respondent in this case, *did*

have its market-based rate authority revoked, because of the actions it took during the time period in which the contracts at issue here were entered into. *Enron Power Mktg., Inc.*, 103 F.E.R.C. ¶ 61,343, at ¶ 62,302 (2003). By revoking that power, FERC restricted Enron's *prospective* power to enter into contracts. *Id.* ¶¶ 62,307-10. The very day after revoking Enron's market-based rate authority, however, FERC denied Nevada Power's request to reform its contracts with Enron even though they were made during the very period FERC identified Enron as grossly abusing and violating its market-based rate authority. *See Order on Initial Decision*, 103 F.E.R.C. at ¶ 62,397. FERC accomplished this result by applying a *Moble-Sierra* "public interest" standard to the contract reformation proceedings. *See id*. By doing so, FERC neither performed the full scope of "just and reasonable" review nor revisited the market circumstances in which the agreements were entered to determine whether those circumstances were sufficiently functional that they were likely to yield long-term contracts within the "just and reasonable" range.

This approach to section 206 review simply cannot be squared with the statutory scheme. Section 206 commands prospective revision of rates that, as of the refund effective date, are not just and reasonable: When FERC determines that a rate is unjust or unreasonable, "the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. § 824e(a). By layering *Mobile-Sierra* review on top of a market-based rate authority that can be revoked only prospectively from the refund effective date, FERC abdicates its statutory responsibility to provide such rate revision when appropriate.

FERC represents in its post-argument submission that the local utilities could have challenged the sellers market-based rate authority at the time they entered into the challenged contracts. That representation is true, but beside the point. Any

such challenge, even if successful, could not have been a basis for reforming the challenged contracts, even if the excessively high rates established by the contracts were strong indications that market-based rate authority *should* be revoked. Rescission of market-based rate authority still would have affected only later contracts, leaving the challenged agreements subject to limited *Mobile-Sierra* public interest review.

As a result of FERC's refusal to consider the abrogation of market-based rate authority except with respect to future contracts, and given the dramatic and sudden nature of the onset of the California energy crisis and the limited period of time that the local utilities had to respond to it, the local utilities here had no meaningful opportunity to institute a challenge to these sellers' market-based rate authority before entering the disputed agreements. For example, in February 2001, California enacted legislation allowing its Department of Water Resources to purchase power on behalf of its deteriorating investor-owned utilities. Southern Cal Water's previous supplier, Dynegy promptly told Southern Cal Water that it was "not interested in extending or renegotiating" its previous one year contract with Southern Cal Water that expired in April 2001, as Dynegy "could sell its generation output to the State of California."

Southern Cal Water was thus left with less than two months to obtain power for the following year and only three "choices": (1) immediately negotiate a long-term contract that could take effect in April 2001; (2) shift to the spot markets, by then recognized by FERC as manipulated and dysfunctional markets that had already caused hyper-pricing and bankrupted several utility companies; or (3) shut down operation and fail to provide electricity for its retail customers. Faced with these choices, Southern Cal Water entered into a forward contract based on a bidding period of little more than two weeks. Under these time constraints, Southern Cal Water could not have challenged the seller's market-based rate authority, obtained an order from FERC, and then negotiated

a forward agreement and signed a contract with the very seller whose market-based rate authority it had just challenged. There was simply no realistic way that Southern Cal Water could continue to participate in the forward market while assuring meaningful "just and reasonable" review.

Ultimately, the fatal flaw in FERC's approach to "oversight" is that it precludes timely consideration of sudden market changes and offers no protection to purchasers victimized by the abuses of sellers or dysfunctional market conditions that FERC itself only notices in hindsight. For example, on December 15, 2000, FERC issued an order encouraging the adoption of long-term contracts and establishing a benchmark price of $74/Mwh. *See December 15 Order*, 93 F.E.R.C. at ¶¶ 61,994-95. FERC promised that it would "be vigilant in monitoring the possible exercise of market power . . . [t]o address concerns about potentially unjust and unreasonable rates in the long-term markets." *Id.* ¶ 61,994. In fact, because of its flawed processes, FERC was never able to "address concerns about potentially unjust and unreasonable rates in the long-term markets," because it had no means to revoke market-based rate authority before the precipitously entered contracts went into effect and became, in FERC's view, no longer subject to cost-based "just and reasonable" review. As a result, FERC failed to detect that, according to its own benchmarks, something was awry in the forward markets that produced these contracts.

As in *Lockyer*, we do not dispute that FERC may adopt a regulatory regime that differs from the historical cost-based regime of the energy market, or that market-based rate authority may be a tenable choice if sufficient safeguards are taken to provide for sufficient oversight. FERC, however, cannot use that choice to excuse its duty to maintain effective oversight and then invoke *Mobile-Sierra* as a ground for precluding ordinary rate review, including review of the propriety of market-based rate authority at the time the contracts became effective. Any other conclusion would permit FERC to abdi-

cate entirely its statutory responsibility under the FPA to ensure that *all* rates, including bilateral contract rates, are "just and reasonable."

## C.    Meaningful Review of Contract Formation

This fundamental procedural error was compounded by FERC's substantive adherence to *Mobile-Sierra* without regard to the market conditions in which the contracts at issue were formed. As we have explained, *Mobile-Sierra* cannot apply without a determination that the challenged contract was initially formed free from the influence of improper factors, such as market manipulation, the leverage of market power, or an otherwise dysfunctional market.

The local utilities argue here that the frenzied market conditions of the California energy crisis in the spot market influenced the forward market in such a manner as to raise a question about what transpired during formation of the forward contracts here at issue. The most important evidence supporting this position is the FERC Staff Report concerning price manipulation in the western United States at the time these contracts were formed. The FERC staff concluded:

> Our analysis shows . . . that forward power prices negotiated during 2000-2001 in the western United States were *significantly influenced* by the then-current spot power prices. This tells us that the *trauma* of the dysfunctional spot power prices at that time *so influenced buyers that they placed great weight on these prices in forming future expectations.*

Staff Report at ES-9 (emphasis added). The report noted that the influence was greatest for one-to-two year forward contracts,[24] and that there is a "statistically significant relationship" between the spot price and forward price. *Id.*

---

[24]Most of the contracts challenged by Nevada Power and Sierra Pacific are within that time range.

Although it noted the Staff's findings, FERC held them irrelevant because they did not demonstrate that the rates in the forward contracts affected the "public interest." *Order on Initial Decision*, 103 F.E.R.C. at ¶ 62,397. FERC therefore did not consider the staff findings in determining *whether* the *Mobile-Sierra* doctrine was applicable to these contracts; instead, FERC discarded the findings after determining, for independent reasons, that the *Mobile-Sierra* doctrine *was* applicable. The upshot is that FERC failed ever to consider whether the influence of the spot markets on the forward markets reached a level sufficient to question whether FERC could assume that two private parties had negotiated a "just and reasonable" contract in the first instance and therefore apply the *Mobile-Sierra* presumption.

FERC's very limited factual findings regarding the state of the market at the time the challenged contracts were negotiated are thus not responsive to the theory advanced by the local utilities here. FERC held only that because the local utilities entered into the challenged contracts "voluntarily" and because "there is no evidence of unfairness, bad faith, or duress in the original negotiations [of the forward contracts], the [local utilities] are not entitled to change their bargains." *Id.* at ¶¶ 62,399-62,400. But the local utilities do not allege that the energy companies manipulated their negotiations of the contracts here at issue; the local utilities challenge the *context*, not the conduct, of those negotiations. Consistently with the Staff Report's findings, the local utilities are maintaining that factors exogenous to the forward market, the dysfunction and manipulation of the spot market, artificially influenced the rates in the forward market, creating market dysfunction in the forward market.[25] The local utilities' argu-

---

[25]FERC's premise, never examined in its orders and opinions, is that the spot and forward markets can and should be analyzed separately. Many of the participants in the two markets are the same, however, as is the product sold — electric power. The only difference is the time frame for delivery of that product. For present purposes, we accept FERC's assumption that the two markets are sufficiently separate that there is at least a question as to the scope of the impact of the dysfunctional spot market on the forward market.

ment is that when such market dysfunction occurs *and* there is no opportunity to revisit the propriety of the market-based rate authority in effect when the contract was entered, FERC cannot assume that contractual terms were just and reasonable as between the contracting parties when the agreement was negotiated. As a result, FERC cannot focus only on "public interest" considerations when the rates established are thereafter challenged.

**[13]** In this case, the questions raised by the Staff Report — whether and how the manipulated spot market influenced the forward markets — *are* relevant to determining whether the *Mobile-Sierra* doctrine applies, because they raise questions about the market conditions at the time of contract formation and thus about the propriety of relying on a regime of market-based rate authority at that time to produce just and reasonable rates. Although FERC "is not obligated to justify deviations from an approach suggested by its own staff," when "the conceptual underpinnings of the staff's approach" are "critical to a reasoned resolution of the problem," then FERC must address them. *Pub. Utils. Comm'n v. FERC*, 817 F.2d 858, 862-63 (D.C. Cir. 1987).

**[14]** We conclude that FERC's decision to treat the market-function evidence as irrelevant to the question *whether Mobile-Sierra* applies, and its resulting application of the *Mobile-Sierra* doctrine, was fundamental error. In a regulatory regime predicated on the grant of market-based rate authority, the decision whether to apply *Mobile-Sierra* to subsequent contracts formed under that authority requires FERC and reviewing courts to determine if the contracts at issue were initially entered into in fully functioning markets. FERC's application of the *Mobile-Sierra* doctrine without considering the contract formation issues was error.

### D.    Effect on the "Public Interest"

**[15]** FERC's error in its approach to deciding *whether* to apply the *Mobile-Sierra* presumption was compounded by its

use of an erroneous standard for determining whether the challenged contracts affect the public interest. As our historical summary shows, electric utility deregulation has made it increasingly necessary for FERC to consider wholesale power contracts' effect on the consuming public. In its efforts to determine the impact on the public interest under *Mobile-Sierra*, however, FERC relied on the wrong legal standard, applying factors taken from the context of a *low-rate* challenge rather than those relevant to the *high-rate* challenge present in this case.

As we discussed in Part II, state agencies in the past regulated heavily the rates charged directly to the public. Electric rate regulation reform, however, has significantly limited the role state regulators play and simultaneously increased the importance of federal regulation for the prices paid by retail ratepayers. FERC's increased responsibility for protecting the public's interest makes its obligation to ensure that wholesale rates do not unjustifiably adversely affect the public — always a part of FERC's statutory mandate — more important than it was when the *Mobile-Sierra* doctrine first developed. Because, at present, FERC, not state regulators, "is perhaps in the best position to reach the most equitable result and to act in the public interest," *Miss. Indus. v. FERC*, 808 F.2d 1525, 1549 (D.C. Cir. 1987) (per curiam) (quoting *Middle S. Serv., Inc.*, 30 F.E.R.C. ¶ 63,030, at ¶ 65,151 (1985)), FERC must give predominant weight in determining whether to modify a contract under section 206 to the impact of a challenged wholesale contract on the rates paid by the consuming public who use the energy covered by the contract. Tested against this protocol, the agency's narrow conception of "public interest" review does not suffice.

FERC determined that the challenged contract rates did not impact the public interest principally because the local utilities presented little evidence relevant to the three public interest factors specifically mentioned in *Sierra*.[26] *Order on Initial*

---

[26] In such circumstances [when the public interest test satisfies FERC's duty to ensure just and reasonable rates] the sole concern

*Decision*, 103 F.E.R.C. at ¶ 62,397. Similarly, FERC's briefs in this court, assume, erroneously, that *Sierra* established a three-prong public interest standard applicable across all circumstances, an assumption with which we do not agree. In particular, the "excessive burden" reference in *Sierra*, heavily relied upon by FERC in this case in concluding that there was no impact on the public interest, has no application here.

As the text from *Sierra*, reproduced in the margins, demonstrates, the three *Sierra* factors were specifically identified as relevant to the *low-rate* challenge presented in that case. Rates asserted to be *lower* than those FERC would approve *ab initio* will not ordinarily directly affect the most obvious "public interest" underlying the FPA — namely, avoidance of unnecessarily high rates for the consuming public. That *Sierra* does not mention such a consideration is thus no wonder. *See Ne. Utils. Serv. Co. v. FERC* (*Ne. Utils. II*), 55 F.3d 686, 691 (1st Cir. 1995) (applying a broader definition of "public interest" in a high-rate challenge because "[i]t all depends on whose ox is gored and how the public interest is affected"); *cf. Permian Basin Area Rate Case*, 390 U.S. 747, 783-84 (1969) (approving Federal Power Commission's setting of maximum rates because of the impact on the public interest). Indeed, the D.C. Circuit has characterized *Sierra* as establishing the rule that "a heavy burden must be met before a *customer* who has negotiated a fixed-price contract can be deprived against his will of the *benefit of his bargain*." *Town of Norwood*, 587 F.2d at 1310 (emphases added). When a customer has negotiated a low contract rate, FERC must meet a high burden before raising that rate. By contrast, in this case, the customer is com-

---

of the Commission would seem to be *whether the rate is so low* as to adversely affect the public interest — as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.

*Sierra*, 350 U.S. at 355 (emphasis added).

plaining of a *high* rate. The concerns in such a high-rate case are not entirely parallel to those in a low-rate case.

The primary "public interest" at issue in a low-rate challenge, such as *Sierra*, is in keeping utilities in operation so the public is not deprived of services. *Sierra* also mentioned avoidance of rates "so low as to . . . cast upon *other* consumers an excessive burden." 350 U.S. at 355 (emphasis added). The reason for concern with "excessive burden" on "*other* consumers" is that charging rates in some wholesale contracts that are too low to recoup production costs and a fair profit could lead utilities burdened with such low rate agreements to recoup their costs and profit margins by charging higher rates than are just and reasonable to other wholesale customers. Such a burden is "excessive" because it requires third parties to pay for costs, including the cost of capital, that properly should have been borne by the consumers who purchase energy covered by the challenged contract. Contrary to FERC's supposition in this case, the reference to an "excessive" burden in *Sierra* did not signal that it is fine to burden customers with unjustifiably higher rates as long as those rates are not so high as to be "excessive" in some absolute sense.

In contrast, the key "public interest" in a high-rate challenge, such as this one, is assuring that the consuming public pays fair rates for the very energy covered by the challenged contracts. *Sierra*'s limitation of relief to cases where "other" customers endure an "excessive burden" has no application to this direct pass-through concern. Instead, if a challenged contract imposes any significant cost on ultimate customers because of a wholesale rate too high to be within a zone of reasonableness, *see INGAA*, 285 F.3d at 31, that contract affects the public interest.

To be sure, the stability of contract considerations that underlie the *Mobile-Sierra* doctrine do carry over to challenges by buyers rather than sellers. *See Mobile*, 350 U.S. at

344 (holding that no party may "unilaterally" change contract because "preserving the integrity of contracts . . . permits the stability of supply arrangements"). Those considerations, however, do not justify abnegation of FERC's statutory responsibility to protect the public from unjustifiably high rates in wholesale contracts.

The public interest standard, consequently, must be adjusted to give appropriate weight to that concern. In particular, in determining whether a challenged rate affects the public interest, FERC must take into account the Supreme Court's admonition that even "a small dent in the consumer's pocket" is relevant to the determination of fair rates. *Texaco I*, 417 U.S. at 399. In the context of a high-rate challenge, consequently, a high-rate public interest determination should focus on whether consumers' electricity bills have been affected by the challenged rates — not necessarily whether the electricity bills have increased since the signing of the contracts, but whether those bills are higher than they would otherwise have been had the challenged contracts called for rates within the just and reasonable range.

**[16]** This is not to say that *any* direct impact on consumer rates is enough to demonstrate a public interest effect sufficient to displace the countervailing *Mobile-Sierra* concern with protecting the stability of contract. Market-based rate regulation presumes — appropriately — that a functioning marketplace will drive prices towards marginal cost, and therefore toward such a reasonable range, "at least over the long pull." *INGAA*, 285 F.3d at 31. Even if a particular rate exceeds marginal cost, however, it may still be within this reasonable range — or "zone of reasonableness" — if that higher-than-cost-based price results from normal market forces and is part of a general trend toward rates that do reflect cost. *See id.* at 32 (noting that brief spikes in pipeline rates "are completely consistent with competition"). Thus, the proper standard for the *Mobile-Sierra* "public interest" mode

of review in a high-rate challenge is not whether the contracted rates pose an "excessive burden" on consumers, but whether the wholesale energy contract is outside the "zone of reasonableness" and results in retail rates higher than would be the case if that zone were not exceeded. This standard mirrors that endorsed by the D.C. Circuit for determination of a just and reasonable rate under a market-based rate regulation regime, *see INGAA*, 285 F.3d at 31-36, and provides an appropriate context for the Supreme Court's "small dent" admonition in such a regulatory environment.

**[17]** After reviewing the record carefully, we are certain that FERC did not properly assess the public interest of any of the contracts before it in this case.

### 1.  *Snohomish*

Snohomish had already increased its retail rates by 35 percent to accommodate the payment of increased prices for power, averaging $125/MWh. Because Snohomish could not obtain forward contracts that allowed it to bring the retail rates back within a normal range, it appears that the contracts at issue did, in fact, impact Snohomish's customers. Contrary to FERC's assertion, it does not matter whether a rate increase occurred before or after a petitioner signed one of the challenged contracts. *See Order on Rehearing*, 105 F.E.R.C. at ¶ 61,986. In either case, the contract could cause customers to pay higher rates than they would have without the contract. Further, FERC specifically found that the challenged Morgan Stanley contract accounted for an eight percent increase for retail ratepayers over 2001 rates. *Id.*

### 2.  *Southern Cal Water*

FERC acknowledged that the challenged contracts led to electric bills of $35.13 per month for some Southern Cal

Water customers. FERC held, however, that Southern Cal Water had not proven that such a bill "amounts to an *excessive* burden on the ratepayers." *Id.* (emphasis added). FERC's rejection of Southern Cal Water's claim because this increase did not amount to an "excessive burden," *id.*, is in error because, as stated above, the "excessive burden" standard, which referred in *Sierra* to the impact on third parties of a wholesale contract so low as to necessitate that costs be recouped from other buyers, does not apply in this case, and did not in any event sanction impacts on consumers as long as not in some absolute sense "excessive."

### 3.  *Nevada Power*

Nevada Power's retail rates decreased after the challenged contracts were negotiated. *Id.* This circumstance, however, cannot alone determine whether those contracts negatively affected the public interest. The decrease from peak rates charged during the crisis does not show that the slightly lower rates that resulted from the forward contracts did not affect the public interest. It is entirely possible that rates had increased so high during the energy crises because of dsyfunction in the spot market that, even with the acknowledged decrease in rates, consumers still paid more under the forward contracts than they otherwise would have. FERC should have performed a more sophisticated economic analysis to determine if the challenged contract affected the public interest.

\*          \*          \*

For the foregoing reasons, we determine that a remand is necessary so that FERC can apply the proper statutory standards to determine, first, whether *Mobile-Sierra* review of the challenged contracts is appropriate; second, if so, to apply the modified form of *Mobile-Sierra* review outlined in this opinion; and finally, if not, to apply full just and reasonable review to the challenged contracts. The petition for review is

hereby granted. We remand this case to FERC for proceedings consistent with this opinion.[27]

**PETITION    FOR    REVIEW    GRANTED    AND REMANDED.**

---

[27]Petitioner Snohomish also claims (1) that two FERC commissioners engaged in ex parte communications with wholesale energy sellers in violation of Snohomish's due process rights; (2) that these same communications violated the Sunshine Act, 5 U.S.C. § 552b; and (3) that certain evidentiary rulings of the Administrative Law Judge violated Snohomish's due process rights. Because our remand order requires FERC to consider the complaints again in the first instance, we do not reach these additional issues.